**UNITED STATES of America, Appellee,**

v.

**Ho–Hsin FAN, Defendant,**

**William Chen and George Huang, Defendants–Appellants.**

Nos. 1722, 751, Dockets 93–1536, 93–1537.

United States Court of Appeals, Second Circuit.

Argued July 22, 1994.

Decided Sept. 16, 1994.

David Cooper, New York City, for defendant-appellant William Chen.

Michael Lee Hertzberg, New York City (Eric M. Lieberman, Daniel Williams, of counsel), for defendant-appellant George Huang.

Michael E. Gertzman, Asst. U.S. Atty., New York City (Mary Jo White, U.S. Atty., Nelson W. Cunningham, Asst. U.S. Atty., of counsel), for appellee.

Before WINTER, McLAUGHLIN and JACOBS, Circuit Judges.

McLAUGHLIN, Circuit Judge:

A jury convicted defendants William Chen and George Huang under 18 U.S.C. § 371 of conspiracy to bring 150 aliens into the United States, in violation of 8 U.S.C. § 1324(a)(1)(A), (1)(D), and (2)(B)(ii). They appeal from a sentence imposed in the United States District Court for the Southern District of New York (Robert P. Patterson, Jr., *Judge*) under the Sentencing Guidelines. Both defendants claim that the district court impermissibly based an upward departure on speculation about the fate that awaited the aliens in the United States. In addition, Huang challenges a four-level adjustment for his leadership role in the offense and a two-level adjustment for perjury. Chen also contests the validity of his own decision to be represented by the same counsel as Huang.

For the reasons set forth below, we affirm.

## BACKGROUND

On September 7, 1993, the United States Coast Guard intercepted the Chin Wing, a Taiwanese fishing vessel owned by the two defendants, off the coast of North Carolina. The Coast Guard discovered 150 Chinese aliens in the fish holds of the vessel. Not one had immigration papers to enter the United States, or any other country for that matter.

Chen, Huang and Ho–Hsin Fan, the captain of the vessel, were indicted under 18 U.S.C. § 371 for conspiring to bring the 150 aliens to the United States, in violation of 8 U.S.C. § 1324(a)(1)(A), (1)(D), and (2)(B)(ii). Captain Fan pled guilty and was sentenced

to 18 months' imprisonment and a $500 fine. (We affirmed his sentence in an unpublished order. *See United States v. Fan*, Dkt. No. 93–1268 (2d Cir. Sept. 13, 1993)). Chen and Huang, however, chose to go to trial.

## I. *The trial*

The case against Chen and Huang proceeded to trial. The facts were hotly contested, and only those relevant to the appeal are recited.

### A. *The government's case*

In July 1991, the defendants bought a small fishing boat in Taiwan. It was named the Chin Wing, and it was purportedly to transport food products from the United States to Haiti. The Chin Wing, however, was never used to transport food. Instead, on April 26, 1992, the Chin Wing picked up 150 Chinese off the coast of Guangdong Province in China.

Each of the passengers, or their families, had paid from $100 to $15,000 to board the Chin Wing, and had agreed to pay a total of $25,000 to $30,000 to be smuggled into the United States. Chen and Huang themselves did not make the voyage. Instead, they hired a crew and Ho–Hsin Fan to captain the vessel, and then they returned to the United States.

Although the Panama Canal offered the shortest and cheapest route from China to the United States, that course presented a problem: any vessel travelling through the Panama Canal must have appropriate documentation for its passengers and crew. The Chin Wing, therefore, sailed south through the Indian Ocean, around the southern tip of Africa, across the Atlantic Ocean, and then north to the United States.

The Chin Wing reached Mauritius, an island nation in the Indian Ocean, about one month after it left China. While in Mauritius, Huang wired approximately $40,000 from New York to resupply the vessel. Huang also received by telecopier at his home in New York various Chinese newspaper articles reporting that the Chin Wing was carry-

ing 150 illegal aliens who were being smuggled into the United States.

Having left Mauritius, the boat broke down, drifting at sea for nearly three weeks. When Huang learned through radio communications with the boat that it was adrift, he flew to Taiwan to meet a mechanic, and then flew to Durban, South Africa with the mechanic. Huang and the mechanic hired a boat which took them out to the crippled Chin Wing. The Chin Wing was towed into Durban, where the crew told the passengers to hide below decks from the South African authorities. While in Durban, four passengers jumped overboard, but were later returned to the boat by South African authorities.

After repairs, the Chin Wing resumed its star-crossed odyssey, setting sail for Port Elizabeth. In Port Elizabeth, South African officials discovered the passengers hiding in the holds of the boat. Huang, who had trailed the Chin Wing, claimed to be unaware of the passengers. One of the officials issued a deficiency notice to Huang and a detention notice to Captain Fan, requiring the vessel to remain in port until it obtained life vests and working life boats. The Chin Wing fled the next day without authorization.

The Chin Wing now sailed to Haiti. The crew instructed the passengers to tell the Haitian authorities that they had been hired to work in Haiti as farmers, fishermen, and fish breeders at a salary of $300 per month. This story, of course, was patently unbelievable because in Haiti unemployment in 1992 was at least 50%, and an agricultural worker, if paid at all, earned less than $60.00 per month.

When the Chin Wing reached Haiti, it was detained by the Haitian government for approximately two weeks. Huang and Chen, who had come to meet the boat, were arrested and held by the government. While in Haiti, Huang and Chen told the American embassy that the 150 Chinese were technical experts hired to work on a vegetable farm, although they could not identify the location of the farm. They claimed that a business partner was arranging for immigration papers for the workers. No such papers had been filed with the Haitian government.

The Chin Wing, Chen and Huang were eventually expelled from Haiti. The day before the Chin Wing sailed from Haiti to the United States, the defendants met with the passengers. Chen told them that he would see them at "the destination" in about one week.

Before reaching the United States, the Chin Wing's crew instructed the passengers to tell American officials the same story that they had tried to pass off to the Haitian officials. The United States Coast Guard intercepted the Chin Wing off the coast of North Carolina after receiving a distress call. When the Chin Wing reached the United States, the Coast Guard contacted Huang regarding the boat. Huang told the Coast Guard that the Chin Wing was going to New York where the passengers would seek employment.

The government offered the foregoing facts as proof of the crime charged in the indictment: that Chen and Huang conspired to bring the 150 illegal aliens into the United States.

## B. *The defense case*

Chen did not testify. The defense consisted principally of George Huang's testimony.

Huang, who owned Chinese restaurants in the New York area, testified that he hired the Chin Wing's crew and arranged with a man in Taiwan whom he knew only as Tony, to recruit 50 men from China to travel to Haiti on the Chin Wing to work for $300 per month. Tony persuaded him to take 80 men instead of 50. Huang and Chen planned to employ the men in the restaurant business and a variety of other businesses, including farming, fishing, shrimp and crab breeding, and clothing manufacturing. Chinese workers were to be used, rather than Haitians, because of their training, experience, and the fact that there would be no language barrier between Chen and Huang and the laborers. Huang testified that when he learned that the Chin Wing was carrying nearly twice the number of passengers he was expecting, he and Chen had no choice but to attempt to employ all of them in Haiti.

Huang denied telling South African officials that he did not know there were passengers aboard the Chin Wing. He admitted, however, that despite the order detaining the Chin Wing in Port Elizabeth, he gave Captain Fan permission to flee because obtaining the life saving equipment required by the South African Government would have caused substantial expense and delay. He stated that he gave the captain a loaded pistol and a stun gun in South Africa because fights had broken out among the passengers at meal times.

Huang also denied that he was unable to tell Haitian officials the location of the farm where the passengers were to work. He testified that he and Chen returned to New York after the Chin Wing left Haiti. Huang said that he believed the Chin Wing would return to Haiti after its government issued immigration visas for the passengers. He denied telling the Coast Guard that the Chin Wing was going to New York so that the passengers could seek work.

On cross-examination, Huang admitted that he and Chen had not purchased the supplies and equipment they would need for their business in Haiti. He also admitted that he had not been in Haiti at any time in 1992 prior to the Chin Wing's arrival.

C. *The jury charge and verdict*

The district judge charged the jury on the object of the conspiracy as follows:

The first objective of the conspiracy charged in the indictment is that George Huang and William Chen, the defendants, and others known and unknown, would and did encourage and induce aliens to come to, enter, or reside at the United States, knowing and in reckless disregard of the fact that such coming to, entry, and residence is and would be in violation of law. The second object of the conspiracy charged in the indictment is that George Huang and William Chen, the defendants, and others known and unknown, would and did bring, or and [sic] attempt to bring, aliens to the United States for the purpose of commercial advantage and private financial gain, knowing, or in reckless disregard of the fact that, those aliens had not re-ceived prior official authorization to come to, enter and reside in the United States.

The jury found Chen and Huang guilty of conspiring to bring the 150 illegal aliens into the United States.

II. *Sentencing*

A. *George Huang*

The district judge sentenced Huang first, calculating a base offense level of 9 under § 2L1.1(a)(2) of the Sentencing Guidelines. Four levels were added under § 3B1.1(a) for Huang's leadership role in an offense involving five or more participants, and two levels were added under § 3C1.1 for perjurious testimony.

The judge then determined that an upward departure was warranted. He departed six levels because of the large number of aliens involved, and another six levels for the dangerous and inhumane conditions aboard the Chin Wing. The district judge also indicated that his decision to depart was influenced by the fear that the aliens would likely be subject to "involuntary servitude" upon their arrival in the United States until they paid what they owed to the smugglers.

These calculations yielded a total offense level of 27, with a corresponding sentencing range of 70–87 months. The district court sentenced Huang to 60 months' imprisonment, which is the maximum sentence permitted by 18 U.S.C. § 371 (the statute Huang violated). Huang was also ordered to pay $11,258.60 in restitution to the Coast Guard, and a $9,000 fine.

B. *William Chen*

For defendant Chen, the district judge again calculated a base offense level of 9, and added four levels for his leadership role. The judge applied to Chen the same 12–level upward departure that it had applied to Huang, yielding a total offense level of 25 and a sentencing range of 57–71 months. Like Huang, Chen received a 60–month sentence and was ordered to pay $11,258.60 in restitution to the Coast Guard, but was not subjected to the additional $9,000 fine.

On appeal, the defendants argue that the district judge impermissibly based the upward departure on his speculation about the fate that awaited the illegal aliens in the United States. Huang also contests the four-level adjustment for his leadership role and the two-level adjustment for perjury. Finally, Chen argues that his decision to be represented by the same counsel as Huang was invalid.

Because we find these arguments meritless, we affirm.

## DISCUSSION

### I. *Upward departure*

The district judge concluded that a 12-level upward departure was appropriate because the Sentencing Guidelines did not adequately take into account several aggravating factors surrounding Chen and Huang's crime.

 Chen and Huang do not contest every factor relied upon by the court. For example, they concede, as they must, that the court properly took into account the large number of aliens involved in the crime in deciding to depart. *See* U.S.S.G. § 2L1.1, comment. (n.8) (Nov. 1991) ("The Commission has not considered offenses involving large numbers of aliens or dangerous or inhumane treatment. An upward departure should be considered in those circumstances."). Instead, Chen and Huang focus their attack on the judge's decision to depart because he believed that the aliens would likely have spent years in involuntary servitude in the United States in order to pay the smuggling fee. Chen and Huang argue that the district court should not have taken this factor into account because there was no evidence in the record that such a fate awaited the aliens. We are not persuaded.

A court may depart from the Sentencing Guidelines if it determines "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission." 18 U.S.C. § 3553(b). *See also United States v. Merritt*, 988 F.2d 1298 (2d Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct.

2933, 124 L.Ed.2d 683 (1993); U.S.S.G. § 5K2.0.

Testimony at trial established that the aliens had paid sums ranging from $100 to $15,000 to board the Chin Wing, and had each agreed to pay a total of $25,000–30,000 to be smuggled into the United States. Thus, upon their arrival in this country, each of the 150 aliens would be indebted to the smugglers in amounts ranging from $10,000 to nearly $30,000. A contract to pay smuggling fees, unenforceable at law or equity, necessarily contemplates other enforcement mechanisms, none of them savory.

It requires no quantum leap in logic to infer from these established facts that these huge debts would be paid through years of labor under circumstances fairly characterized as involuntary servitude. Certainly, the district judge was permitted to draw such a conclusion from the record. "There comes a point where the court should not be ignorant as judges of what we know as men." *Watts v. Indiana*, 338 U.S. 49, 52, 69 S.Ct. 1347, 1349, 93 L.Ed. 1801 (1949) (Frankfurter, *J.*). Accordingly, the district judge properly considered this sad reality as one aggravating circumstance supporting an upward departure.

 Huang also argues that the district judge departed from the Guidelines because he decided that Huang violated other criminal statutes carrying stiffer penalties than those in 18 U.S.C. § 371. The record does not support this contention. The district court did mention the offense level for another crime, 18 U.S.C. § 1201 (the federal kidnapping statute), in deciding *how far* to depart, not *whether* to depart. Reference to an analogous statute is a well-established method to determine the magnitude of an upward departure. *See United States v. Joyner*, 924 F.2d 454 (2d Cir.1991). Given the captain's use of a stun gun and his brandishing of a conventional gun (both of which were supplied by Huang) during the Chin Wing's voyage, we find ample support for the district court's consideration of § 1201 in measuring the magnitude of the departure.

 Finally, Chen challenges the district court's finding that inhumane conditions

aboard the Chin Wing supported an upward departure. He argues that conditions aboard the vessel were not, in fact, inhumane. Evidence from trial illustrates the fatuity of this argument.

The Chin Wing was designed as a fishing vessel. It was ill-equipped for 150 passengers. The aliens were forced to live in fish holds for 18 weeks. There was only one bathroom. There were inadequate life preservers and life rafts, even though the boat broke down constantly. At one point, it drifted helplessly at sea for nearly three weeks. The captain brandished a gun to maintain order. Upon boarding the boat off North Carolina, Coast Guard officers saw "human waste everywhere, all over the deck, food scraps all over the deck.... people on board were sleeping ... wherever...." Pictures and a videotape documenting the misery aboard the ship offered compelling support for the departure.

## II. *Huang's four-level adjustment for leadership role*

■ Huang concedes that he was an "organizer" of criminal activity and therefore subject to a *two*-level increase in his offense level under U.S.S.G. § 3B1.1(c). He argues, however, that the district court erred in imposing a *four*-level increase under § 3B1.1(a), claiming that he was not "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." A participant is someone "who is criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.1, comment. (n. 1).

Huang does not dispute that Fan, the captain of the vessel, was a participant within the meaning of § 3B1.1(a). Presumably, Huang would also concede that his co-defendant, Chen, was a participant. Huang contends, however, that none of the remaining Chin Wing crew members qualifies as a participant. He claims that trial testimony established that the crew members were merely "routine seamen" hired to assist in navigating the Chin Wing to Haiti. We disagree.

Substantial evidence at trial indicated that the uncharged crew members of the Chin Wing participated in the plot to smuggle illegal aliens into the United States. The crew members made the entire journey from China to the United States. They were paid by Huang and Chen. The crew directed the passengers to hide below decks from the authorities in South Africa, and told them to lie to authorities in Haiti and in the United States. Thus, the district judge's conclusion that the crew members were "participants" was not erroneous.

## III. *Huang's two-level adjustment for obstruction of justice*

■ The district court imposed a two-level obstruction of justice adjustment on Huang for his perjurious testimony. Huang argues that the adjustment was improper because the jury's guilty verdict does not necessarily mean that his testimony was dishonest. He claims that the jury could have believed his testimony that his original plan was to transport the illegal aliens to Haiti, and that the jury could have concluded that only later did he decide to bring the aliens to the United States. Thus, runs the argument, Huang would be guilty of the second object of the conspiracy—bringing illegal aliens to the United States—but innocent of the first—inducing illegal aliens to come to the United States; and Huang would be innocent of perjury.

The Sentencing Guidelines provide for a two-level increase in the offense level "[i]f the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution or sentencing of the instant offense." U.S.S.G. § 3C1.1. The Guidelines specify that perjury is a "type[ ] of conduct to which this enhancement applies." *Id.*, comment. (n.3). For Guidelines purposes, perjury is defined as "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake or faulty memory." *United States v. Dunnigan*, ── U.S. ──, ──, 113 S.Ct. 1111, 1116, 122 L.Ed.2d 445 (1993) (relying on the definition of perjury set forth in 18 U.S.C. § 1621).

■ While a court may not automatically impose the two-level adjustment solely because the defendant testified at trial and was subsequently convicted, *Dunnigan,* at ——, 113 S.Ct. at 1116–17, the adjustment is not limited to those instances where the jury's verdict *necessarily* reflects disbelief of the defendant's testimony. *United States v. Johnson,* 968 F.2d 208, 216 (2d Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 436, 121 L.Ed.2d 355 (1992). Instead, where a finding of perjury does not necessarily follow from the jury's verdict, the court must base its decision to impose the two-level adjustment on the evidence adduced at trial. *Dunnigan,* —— U.S. at ——, 113 S.Ct. at 1117; *Johnson,* 968 F.2d at 216. Although separate findings of fact regarding the alleged perjury are encouraged, "a general finding of obstruction that tracks those factual predicates necessary ·to support a finding of perjury will suffice." *United States v. Shonubi,* 998 F.2d 84, 88 (2d Cir.1993).

Assuming that the jury's verdict here does not inexorably reflect a disbelief of Huang's incredible testimony at trial—a generous assumption—Huang's argument still fails. The district court pointed to specific testimony that Huang understood the detailed paperwork necessary to enter a country legally and that he knew the names of the people on his vessel; yet he made no effort to apply for working papers for them in Haiti. The court also credited the government's argument that Huang's testimony was contradicted by several witnesses. The district court further found that Huang's testimony was internally inconsistent on important points. Finally, the court found Huang's claim that he intended to employ the illegal aliens in Haiti at $300 per month to produce goods for export to the United States patently unbelievable in light of (1) widespread unemployment in Haiti, (2) the United States embargo against Haitian goods, and (3) the fact that the average Haitian wage at the time was $330 *per year.* Accordingly, the adjustment for perjury was proper.

## IV. *Chen's choice of counsel*

Finally, Chen argues that his Sixth Amendment rights were violated because his decision to be represented by the same counsel as his co-defendant Huang was invalid. We . disagree.

### A. *The* Curcio *hearing*

Chen and Huang both retained the same attorney, Stephen Flamhaft, to represent them. Because of the potential conflict of interest that could arise from joint representation, the district court conducted a hearing pursuant to *United States v. Curcio,* 680 F.2d 881 (2d Cir.1982) ("*Curcio* hearing"). The hearing occurred in two stages. Since Huang does not contest the validity of his *Curcio* hearing, the proceedings involving him are omitted. Chen was assisted by an interpreter at both stages of his hearing.

At the first stage of Chen's *Curcio* hearing, the district judge explained that Chen was entitled to a lawyer who would represent him with undivided loyalty; and that when the lawyer seeks to represent two defendants situations may arise where his loyalty cannot remain undivided. The judge told Chen that a lawyer would be appointed for him if he could not afford to retain one himself. Giving examples of specific conflicts that could arise, the judge mentioned cross-examination problems where the questioning might aid one defendant while injuring the other. Decisions on whether to cooperate with the government, whether to plead guilty, problems of confidentiality and the attorney-client privilege are exacerbated by joint representation and Mr. Chen was so cautioned.

Mr. Chen, who had a high school education in Taiwan, then engaged in the following colloquy with Judge Patterson:

> THE COURT: Without talking about this case, put this case out of your mind, do you understand how in a trial a lawyer could be subject to a conflict?
>
> CHEN: I never had that kind of experience before so the first time I heard it from you.
>
> THE COURT: Do you understand?
>
> CHEN: I do understand now.
>
> THE COURT: Would you try to explain in general without referring to the facts of this case in any way how that conflict could arise?

CHEN: Just like if some kind of case maybe put him in, and against him, and that's against each other, like the judge explain.

Before concluding the first stage of the *Curcio* hearing, the court advised Chen that he could consult an independent lawyer concerning the potential conflict of interest. Chen replied: "I understand, thank you."

At the second stage of Chen's *Curcio* hearing, conducted one week after the first stage, Judge Patterson began by reminding the defendant of the problems that he had highlighted a week earlier. Mr. Chen stated that he remembered the discussion and that he understood the risks inherent in joint representation. The court then asked Chen if "under those circumstances" he wanted to continue with Mr. Flamhaft or retain someone else. Chen replied:

> This attorney was hired by me before all this happened and when I met with your Honor last time since I have not had enough time to consider hiring another attorney and since my present attorney understands the circumstances better I would like to continue having him represent me.

To ensure that Chen did not mistakenly believe that his choices were limited to Mr. Flamhaft or an unprepared lawyer, the court stated:

> ... I don't want him to think that if he wants another attorney that he is faced with the alternative of having an unprepared ... [attorney] represent him during a hearing as opposed to a prepared Mr. Flamhaft. That isn't the alternative.
>
> The question is, Mr. Chen, whether you wish to waive the conflicts of interest and proceed with Mr. Flamhaft as the attorney or not?

Chen responded that he wanted to continue to be represented by Stephen Flamhaft. The court concluded the second stage of Chen's *Curcio* hearing by again asking Chen if he needed more time to make a decision:

> THE COURT: Mr. Chen, the government's attorney reminds me that at one point today you thought you needed more time to decide whether you wished to

proceed with Mr. Flamhaft or wanted to get another attorney. Do you need more time or not?
>
> CHEN: I don't need more time.
>
> THE COURT: You don't need more time? You've made up your mind?
>
> CHEN: Yes, I have.

## B. *The merits*

■ Joint representation brings two constitutional rights into potential conflict: "the right of a criminal defendant to be represented by counsel of his own choice and the right of such a defendant to counsel whose effectiveness is unimpaired by divided loyalty." *United States v. Curcio*, 694 F.2d 14, 22 (2d Cir.1982). A criminal defendant is free to prefer the right to counsel of his choosing over the right to counsel of undivided loyalty, provided that the choice is "knowing and intelligent," a matter which depends upon the facts and circumstances of each case. *See Edwards v. Arizona*, 451 U.S. 477, 482, 101 S.Ct. 1880, 1883–84, 68 L.Ed.2d 378 (1981).

To ensure that the defendant's choice is knowing and intelligent, we have instructed trial judges to:

> (i) advise the defendant of the dangers arising from the particular conflict; (ii) determine through questions that are likely to be answered in narrative form whether the defendant understands those risks and freely chooses to run them; and (iii) give the defendant time to digest and contemplate the risks after encouraging him or her to seek advice from independent counsel.

*United States v. Iorizzo*, 786 F.2d 52, 59 (2d Cir.1986) (citing *United States v. Curcio*, 680 F.2d 881, 888–90 (2d Cir.1982)). *See also* Fed.R.Crim.P. 44(c) (requiring district court to advise jointly-represented defendants of the potential for conflicts of interest).

■ The transcript from Chen's hearing shows that the district court complied with the *Curcio* standards. At the first stage of the hearing, the district court advised Chen of the dangers inherent in proceeding with an attorney who was also representing his co-defendant Huang. The court elaborated on the conflicts that might arise, and deter-

mined that Chen understood his rights and the nature of the potential conflicts. The court afforded Chen one week to discuss the matter with independent counsel, encouraging him to do so and advising him that an attorney would be appointed if he could not afford one.

A week later, the court again explained Chen's right to counsel of undivided loyalty. Chen stated unequivocally that he wished to proceed with the attorney who was also representing Huang. He firmly declined an offer for yet another postponement to think over the matter, and indicated in no uncertain terms that he understood his rights and the potential problems with joint representation. The hearing ended with Chen categorically stating that he had decided to proceed with his original attorney and that he required no more time to consider his options.

Despite the district court's compliance with *Curcio*, Chen now contends that his one inelegant answer to a question during the hearing demonstrates that he failed to understand the choice he was making. When asked by the court if he could explain how a conflict might arise when a lawyer represents co-defendants, Chen responded: "Just like if some kind of case maybe put him in, and against him, and that's against each other, like the judge explain." We do not believe this excerpt from the hearing undermines the district court's conclusion that Chen's waiver was knowing and intelligent. In fact, this response, inartful though it was, conveys Chen's understanding that Huang's interests could be adverse to his own.

There was an interpreter present at both stages of the *Curcio* hearing. Chen, a high school graduate, repeatedly told the district court that he appreciated his right to conflict-free counsel and the implications of joint-representation. *Curcio* does not require that the district judge be omniscient. Nor does it absolve the defendant of *any* responsibility for his own fate. If Chen truly did not understand what was going on—a proposition which we believe unfounded—he should have accepted the court's offer to consult with another attorney, or at least have expressed his confusion to the court. Instead, he repeatedly stated that he under-

stood the potential for conflict implicit in joint representation. We are satisfied that Chen understood his rights and made a knowing and intelligent decision to proceed with Mr. Flamhaft. *Curcio* was fully complied with.

## CONCLUSION

We have considered all of the defendants' remaining arguments, and find them to be without merit. Accordingly, the judgment of the district court is affirmed.