**UNITED STATES of America,**
**Appellee,**

v.

**SI LU TIAN, also known as Ah Long,**
**Defendant–Appellant.**

**No. 02–1502.**

United States Court of Appeals,
Second Circuit.

Argued May 7, 2003.

Decided Aug. 12, 2003.

---

Tracy W. Young, New York City (Joyce C. London, New York City, of counsel), for Appellant.

Joon H. Kim, Assistant United States Attorney, Southern District of New York, New York City (James B. Comey, United States Attorney for the Southern District of New York, James G. Cavoli, Assistant United States Attorney, Southern District of New York, New York City, of counsel), for Appellee.

Before: MESKILL, JACOBS and SOTOMAYOR, Circuit Judges.

MESKILL, Circuit Judge.

Defendant-appellant Tian Si Lu (Lu)[1] appeals from a judgment of conviction after a jury trial in the United States District Court for the Southern District of New York, Koeltl, *J.*, for (1) conspiring to hold Chinese nationals hostage in violation of the Hostage Taking Act, 18 U.S.C. § 1203(a), (2) taking hostage of a Chinese national and holding her for ransom in violation of 18 U.S.C. §§ 1203(a) & 2, (3) conspiring to smuggle over 100 Chinese nationals into the United States in violation of 18 U.S.C. § 371, and (4) smuggling a Chinese national into the United States in violation of 8 U.S.C. § 1324(a)(2)(B)(ii) and 18 U.S.C. § 2.

On appeal, Lu challenges only his convictions on Count One for conspiring to hold hostage aliens who were smuggled into the United States, and Count Two for holding hostage a female alien, Yong Fang

---

1. The indictment in this action identifies the defendant-appellant as "Tian Si Lu." Although the parties spell the defendant-appel-lant's name differently, they both refer to him, as we do, as Lu.

Chen (Chen). Specifically, he contends that the evidence at trial was insufficient to establish a conviction for hostage taking, or conspiracy to commit hostage taking, because the government failed to prove that the aliens were "detained" or "seized" within the meaning of the Hostage Taking Act. In a similar vein, he argues that the district court committed plain error by instructing the jury that it could find that the aliens were detained even though they may have initially agreed in their smuggling agreements to accompany their smugglers to the United States. Finally, Lu claims that the district court improperly imposed a four-level enhancement under United States Sentencing Guidelines § 3B1.1(a) (U.S.S.G. § 3B1.1(a)) for his role as an organizer or leader in criminal activity that involved five or more participants or was otherwise extensive. For the reasons set forth below, we affirm.

Subject matter jurisdiction was proper in the district court because Lu was charged with offenses against the laws of the United States. *See* 18 U.S.C. § 3231. "Appellate jurisdiction is appropriate because we have jurisdiction to consider appeals from final decisions of the district courts, which are judgments of conviction and sentence in criminal cases." *United States v. Schultz*, 333 F.3d 393, 395 (2d Cir.2003) (internal citations, alteration and quotation marks omitted).

## BACKGROUND

### The Smuggling Scheme

The jury heard evidence that Lu and others operated a scheme to smuggle willing Chinese aliens into the United States for an agreed upon price. In June 1999, approximately 100 of these aliens crowded onto an old fishing boat in the People's Republic of China (PRC) and set sail for the western coast of Canada. Prior to boarding the vessel, the aliens were held in various houses and guarded by individuals armed with "sticks and guns."

The fishing boat arrived in Canada in July 1999. There, "snakeheads"—the name given to smugglers—took custody of the aliens, herded them into a large warehouse, and ultimately transported them to Toronto, Canada. While in the snakeheads' custody in Canada, several aliens received beatings from their escorts. Eventually, the snakeheads smuggled the aliens into New York City where they were released after paying their respective smuggling fees. Aliens who did not pay their smuggling fees, however, were held in various locations throughout the city by other snakeheads. These aliens were told that if their relatives failed to pay their smuggling fees, they would be held longer and beaten.

### Lu's Role in the Smuggling Scheme

The government presented the testimony of Yi Ming Li (Li), a snakehead who worked with Lu and ultimately pled guilty to one count of conspiracy to commit hostage taking and one substantive count of hostage taking. Li testified that he met with Lu and an individual named Xin Ping (Ping) at a Chinese restaurant in Brooklyn, New York in June 1999. There, Ping asked Li to help with the alien smuggling operation by guarding the aliens once they arrived in New York City. Li agreed. As a guard, Li's job was to hold the aliens who had not paid their smuggling fees and release them to their relatives only after their fees had been paid. Li testified that during this meeting with Lu and Ping, Ping told him (1) that Lu was "one of the bosses" of the smuggling operation, (2) that Li should consult Lu if any questions arose concerning the smuggling operation, (3) that Li should take instructions from Lu once the aliens arrived in New York,

and (4) that Lu was "the boss in New York."

In addition to guarding the aliens, Li helped on the New York end of the smuggling operation by working with snakeheads from Canada who transported the aliens into New York City. According to his testimony, Li worked with two individuals in Canada: Long Jie (Jie) and a man Li knew only as "Japanese Boy." According to Li, Japanese Boy was the "boss" in Canada. At Japanese Boy's direction, Jie would transport small groups of aliens on the last leg of their trip from Canada to New York City. Once in New York City, Jie would call Li and set up a meeting point. Li would then meet Jie and pick up the aliens.

After Li picked up a group of aliens from Jie in New York City, his practice was to call Lu and Ping to determine (1) whether to hold the aliens and (2) whether the aliens were "customers" of Lu's or Ping's. If the aliens were customers of Lu's, Li transferred them to Lu or individuals working under Lu. In total, Li and another guard he hired, Ben Yong Zhang, picked up eight different groups of aliens brought to New York City by Jie. Each group consisted of three or four aliens.

Li testified that when the first group of aliens arrived in the middle of July 1999, Jie contacted him and told him to bring $30,000 to a meeting place where Jie would drop off the aliens in exchange for the money. The $30,000 represented Jie's fee for bringing the aliens from Canada to New York City. When Li learned of this fee, he called Lu and told him that he needed $30,000 to pick up the first group of aliens. Lu responded by delivering the money to Li's house later that evening. Li then called Jie to set up a meeting in Brooklyn where the two exchanged the money for the first group of aliens. Several days later, Lu supplied Li with another

$30,000 to pay Jie for the second group of aliens transported to New York City.

The first two groups of aliens that arrived in New York City were customers of Ping's. The third group belonged to Lu. After Li picked up this group from Jie, he drove them to Flushing, New York and delivered them, at Lu's direction, to a person named Fei Jei. Fei Jei worked for Lu, helping him transport, hold, and guard the aliens. The fourth group of aliens that Li retrieved from Jie belonged to Ping. The fifth group of aliens that arrived in New York City included four female aliens. According to the list of customers kept by Lu and Ping, this group belonged to Lu. Li testified that after he picked up the fifth group of aliens, Lu instructed him to take them to Li's apartment and hold them there for a short period of time. Later, Lu met Li at the apartment, went inside, and told the aliens to "hurry up and pay the money." He also threatened them, telling them that if they did not pay, they would be beaten and/or forced to pay an additional $1,000 each. Li heard Lu conveying this same message over the phone to relatives of the aliens. Li testified that the aliens appeared nervous and scared after hearing Lu's threats. During this same visit to Li's apartment, Lu ordered Li to beat one specific male alien who, after being held for two days, had not yet paid his smuggling fee. Lu also instructed Li to rent a basement in which to hold certain aliens who had not yet paid their fees. Of the remaining three groups of aliens smuggled into the United States by Jie, one belonged to Lu and two belonged to Ping.

After being informed by a confidential source that Chen was about to be released at a specific location in New York City's Chinatown, INS agents observed Lu arrive at that location. There, Lu met with Chen's relatives and accepted a brown pa-

per bag from them. Shortly after the exchange of the brown paper bag, another Asian male arrived in a separate vehicle and released Chen to the same relatives who had turned over the brown paper bag to Lu moments before.

*Testimony of Smuggled Aliens Zehng Rong Xiao and Chen*

The government also presented the testimony of two smuggled aliens: Chen and Zheng Rong Xiao (Xiao). Xiao, a 27 year-old male, testified that he and his family made arrangements for the snakeheads to smuggle him into the United States for $40,000. According to Xiao's testimony, the smugglers were to be paid after Xiao was delivered to his relatives in the United States. While traveling across Canada, Xiao learned that the snakeheads had increased the smuggling fee from $40,000 to $50,000. When Xiao arrived in New York, contrary to the earlier arrangement to which he had agreed, his smugglers told him that he would be released to his relatives only *after* he paid the new $50,000 fee. Because he could not come up with this additional money, Xiao was held in Li's apartment for approximately three days. Xiao testified that during these three days, he wanted to be released; in his words "the sooner [he was released] the better." Xiao also testified that at various points during his travels from the PRC to New York City, he (1) witnessed snakeheads beat two aliens, (2) was warned by snakeheads not to attempt to flee, (3) did not know where he was, and (4) "did not dare to run away." Xiao ultimately was freed when INS agents raided Li's apartment in August 1999 and arrested Li, Xiao and five other aliens who had been smuggled into the United States.

Chen testified that she had arranged for the snakeheads to smuggle her into the United States in exchange for $43,000. On cross-examination, Chen conceded that her agreement with the snakeheads required that she pay them *before* she could be released. Like Xiao, Chen testified that throughout her journey from the PRC to the United States, she witnessed snakeheads carrying sticks and beating other aliens. She testified that watching the snakeheads physically abuse the other aliens "scared" her.

When Chen arrived in New York City, she had no money and did not speak English. Because she was unable to pay the agreed-upon fee, she was held in an apartment in the city for twenty days. During this period of time, Chen testified, she was "very anxious" and "wanted to get out sooner," but was precluded from doing so. In addition, Chen (1) was only allowed to go outside the apartment once, (2) was prohibited from seeing any family members, and (3) was threatened with being sold to a prostitution house if she was unable to pay the agreed-upon fee. Finally, on August 30, 1999, Chen was "let go" after her relatives paid Lu $15,000— $28,000 less than the agreed-upon fee.

*The Defendant's Case*

Lu presented the testimony of two aliens who were on the fishing boat that arrived on the western coast of Canada in July 1999. These aliens claimed to be related to Lu. They testified that Lu paid their smuggling fees, but that he played no further role in the smuggling operation. Lu also presented the testimony of an Assistant United States Attorney who conceded that during a proffer session with Li, Li told him that some of the aliens, in fact, were related to Lu.

*Procedural History*

Trial commenced on November 5, 2001, and on November 30, 2001, the jury found Lu guilty on all four counts charged in the indictment. On January 15, 2002, Lu moved for a judgment of acquittal pursu-

ant to Rule 29 of the Federal Rules of Criminal Procedure and for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure. In this combined motion, Lu argued that there was insufficient evidence from which a reasonable jury could have concluded that he held Chen, who was the subject of the substantive charge of hostage taking, against her will. Specifically, Lu argued that Chen was not detained, as required under the Hostage Taking Act, because she had earlier agreed to accompany the snakeheads and had agreed that she would not be released until payment was made. Lu made a similar argument with respect to the charge that he conspired to commit hostage taking. The government filed opposition papers, and on May 3, 2002, the district court issued a written decision denying Lu's motions.

On August 9, 2002, the district court sentenced Lu principally to 168 months imprisonment. In arriving at this sentence, the district court imposed a four-level enhancement pursuant to U.S.S.G. § 3B1.1, because it found that Lu was a leader or organizer in criminal activity that involved five or more persons or that was otherwise extensive. On August 14, 2002, Lu filed a timely notice of appeal.

## DISCUSSION

I. *Sufficiency of the Evidence Supporting Lu's Conviction Under the Hostage Taking Act*

A. *Standard of Review*

■ "A defendant challenging his verdict on sufficiency grounds bears a 'heavy burden.'" *United States v. McCarthy*, 271 F.3d 387, 394 (2d Cir.2001) (citation omitted). We must affirm a conviction if, "viewing all the evidence in the light most favorable to the prosecution, 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Samaria*, 239 F.3d 228, 233 (2d Cir.2001) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). When reviewing such challenges, "[w]e defer to the jury's determination of the weight of the evidence and the credibility of the witnesses, and to the jury's choice of the competing inferences that can be drawn from the evidence." *United States v. Morrison*, 153 F.3d 34, 49 (2d Cir.1998) (citation omitted).

B. *The Merits*

■ The Hostage Taking Act provides, in pertinent part, that

whoever, whether inside or outside the United States, seizes or detains and threatens to kill, to injure, or to continue to detain another person in order to compel a third person or a governmental organization to do or abstain from doing any act as an explicit or implicit condition for the release of the person detained, or attempts or conspires to do so, shall be punished by imprisonment for any term of years or for life and, if the death of any person results, shall be punished by death or life imprisonment.

18 U.S.C. § 1203(a) (2000). To obtain a conviction under the Hostage Taking Act, the government must prove that the defendant (1) seized or detained another person, and (2) threatened to kill, injure, or continue to detain that person (3) with the purpose of compelling a third person or governmental organization to act in some way, or to refrain from acting in some way. *See United States v. Lin*, 101 F.3d 760, 766 (D.C.Cir.1996); *United States v. Lopez–Flores*, 63 F.3d 1468, 1476 (9th Cir.1995); *United States v. Carrion–Caliz*, 944 F.2d 220, 223, 225 (5th Cir.1991).

On appeal, Lu challenges *only* the first requirement as it applies to both the con-

spiracy and substantive counts of hostage taking. He contends that the evidence was insufficient to show that there was a seizure or detention within the meaning of the Hostage Taking Act because the aliens consented to being smuggled into the United States by virtue of their unwritten smuggling agreements. Lu maintains that because the evidence showed that the aliens were held in a manner contemplated by their respective smuggling agreements, no seizure or detention occurred.

In making this argument, Lu relies on the Ninth Circuit's recent decision in *United States v. Sierra–Velasquez*, 310 F.3d 1217 (9th Cir.2002), *cert. denied*, 123 S.Ct. 1640 (2003). There, defendants involved in an illegal alien smuggling operation similar to the one described above challenged their convictions under the Hostage Taking Act. *See id.* at 1219–20. They maintained that the evidence was insufficient to sustain their convictions because they had never increased the aliens' smuggling fees beyond the amount initially agreed on. *See id.* at 1220. Affirming the convictions, the court of appeals rejected the defendants' challenge and held that the aliens had been seized or detained "within the meaning of [the Hostage Taking Act] from the time the defendants began to hold [them] in a manner that *was not* contemplated in the alien smuggling agreement." *Id.* (emphasis added). "At that point," the court explained, "the aliens were no longer consensually in the custody of the smuggling defendants." *Id.* Assuming the converse to be true, Lu contends that because he held the aliens in a manner that *was* contemplated by the smuggling agreement, no detention occurred.

### 1. *The Conspiracy Count*

■ Even if we construed *Sierra–Velasquez* in the manner advanced by Lu, it provides him little help with respect to the

conspiracy count. The evidence adduced at trial shows that at least one alien, Xiao, was detained in a manner *not* contemplated by his smuggling agreement.

As recounted earlier, Xiao testified that his initial smuggling arrangement provided that Lu and the snakeheads would smuggle him into the United States for a fee of $40,000, and that Xiao (or his relatives) would pay that fee *after* Xiao's release. Xiao testified that during his journey across Canada, he was told (for the first time) that the snakeheads had increased the smuggling fee by $10,000. He further testified that once he arrived in New York, he was informed, contrary to the original terms of his initial smuggling arrangement, that his relatives would be required to pay the snakeheads *before* Xiao was released. Because the two most material terms of the smuggling arrangement—the timing and amount of the payment—were altered *after* Xiao consented to being detained, an argument based on *Sierra–Velasquez* must fail. The evidence presented at trial was sufficient for the jury to conclude that Xiao *did not* consent to the materially different smuggling arrangement he was held to *after* his initial consent was given. In any event, as the discussion of the substantive count (below) explains, a smuggler's compliance with the terms of a smuggling contract does not matter if the person detained wants to go free.

### 2. *The Substantive Count*

■ If Lu's view of *Sierra–Velasquez* represented the only way the government could prove a seizure or detention under 18 U.S.C. § 1203(a) in the context of an illegal smuggling operation, his argument on appeal would have more force when applied to the substantive hostage-taking count involving Chen. The evidence at trial showed that Chen agreed to pay the

snakeheads $43,000 to smuggle her into the United States. On cross-examination, Chen conceded that she agreed to pay her fee before—and as a condition to—her release to relatives in New York. Ultimately, however, Chen was unable to pay the full smuggling fee and, after being held for twenty days, she was released to her relatives for $15,000—$28,000 less than the amount she and the snakeheads initially agreed on.

■ *Sierra–Velasquez*, however, does not define the outer limits of what constitutes a detention for the purpose of the Hostage Taking Act in the context of an illegal smuggling operation. While the government *may* satisfy the detention element by showing that an alien was held in "a manner that was *not* contemplated in the alien smuggling agreement," *Sierra–Velasquez*, 310 F.3d at 1220 (emphasis added), we reject Lu's position that this represents the *only* way in which that element can be established. We hold instead, as at least one other court has, "that a hostage is 'seized' or 'detained' within the meaning of the Hostage Taking Act when she is held or confined against her will for an appreciable period of time." *Carrion–Caliz*, 944 F.2d at 225.

■ *Sierra–Velasquez* aside, Lu seems to argue that the evidence was insufficient to establish a seizure or detention because the words "seize" and "detain" imply a lack of voluntariness, which is absent in Chen's case because she manifested her consent to be held by agreeing to the smuggling arrangement described above. Because that arrangement contemplated, from the outset, that the snakeheads would hold Chen until she paid her fee, Lu contends that any subsequent restraint was voluntary regardless of any fear or anxiety felt by Chen. Underlying Lu's argument in this respect is the assumption that an alien's initial agreement to accompany his smugglers precludes a finding of later detention. The Hostage Taking Act, however, does not require that a seizure or detention be against a hostage's will from its inception. *See Carrion–Caliz*, 944 F.2d at 226. "[T]hat the hostage may initially agree to accompany the hostage taker does not prevent a later 'seizure' or 'detention' within the meaning of the Hostage Taking Act." *Id.* Cases decided under the Federal Kidnapping statute, 18 U.S.C. § 1201, which makes it unlawful to seize or confine a person under certain circumstances, provide further support for this interpretation of the detention element of the Hostage Taking Act. *See United States v. Eagle Thunder*, 893 F.2d 950, 952 (8th Cir.1990) (holding that victim's initial consent to accompany kidnapper did not preclude kidnapping conviction where victim was later detained); *United States v. Wesson*, 779 F.2d 1443, 1444 (9th Cir.1986) (per curiam) (upholding conviction under Federal Kidnapping statute where victim may have initially agreed to accompany defendant but where victim later expressed her desire to go home). In view of these decisions, we conclude that Chen's initial consent to be smuggled into the United States does not preclude Lu's conviction as long as the evidence was sufficient to prove that, at some point, Chen was held "against her will for an appreciable period of time." *Carrion–Caliz*, 944 F.2d at 225; *see also id.* at 226 ("[T]he dispositive question is not whether [the hostages] initially agreed to go to [the hostage taker's] house, but rather whether [the hostages] later were detained or confined there against their will."). A person who agrees to be confined, held for ransom, and beaten may nevertheless unilaterally revoke that arrangement at any time, and the contractual nature of the detention does not run counter to a finding that a person who wishes to be free is being detained

against her will. It is no valid objection to say that such derogation of the smuggling contract removes the financial incentive to smuggle undocumented aliens.

 To prove that an individual has been held against her will, the government need not show that the defendant actually used physical force or violence to restrain that person. *See id.* at 225; *cf. United States v. Macklin,* 671 F.2d 60, 64 (2d Cir.1982) (noting that to be convicted of kidnapping, a defendant must use "some means of force—actual or *threatened,* physical or *mental*—... so that the victim is taken, held and transported against his or her will" (emphasis added)). In finding the detention element of a hostage-taking violation met, a jury is entitled to rely on evidence showing that the defendant threatened, frightened, deceived or coerced his hostage so as to cause the hostage to remain under the defendant's control. *See Carrion–Caliz,* 944 F.2d at 227 (holding that evidence was sufficient to show that defendant "frighten[ed] and deceiv[ed] [the hostages] sufficiently to cause them to remain at his house"); *cf. Macklin,* 671 F.2d at 64.

The Fifth Circuit's decision in *Carrion–Caliz* provides an illustrative example of how a detention can occur even in the absence of physical restraint. The defendant in that case accepted $2,000 from four Guatemalan aliens in exchange for his help in smuggling them into the United States to see a family member. *See Carrion–Caliz,* 944 F.2d at 221. After the aliens and the defendant made their way across the border, the defendant and another individual took three of the aliens to the defendant's home where they remained for approximately eight days. *See id.* During this time, the defendant called the family member that the aliens intended to visit and demanded that the family member pay $3,000 in exchange for the safe delivery of the aliens. *See id.* at 222. Authorities arrested the defendant while he was attempting to collect the ransom, and he ultimately was convicted of three counts of hostage taking. *See id.*

On appeal, the defendant argued that there was not enough evidence to show that a detention had occurred because he had neither threatened the aliens with injury nor physically restrained them. *See id.* at 226. The aliens, he maintained, were always free to leave. *See id.* The court rejected this argument, explaining that the defendant's failure to "physically restrain or threaten his hostages does not mean that he did not seize or detain them within the meaning of the Hostage Taking Act." *Id.* at 226–27. "It is enough," the court held, "that [the defendant] frightened or deceived [the hostages] sufficiently to cause them to remain in his house when they would have preferred to join" their family member elsewhere. *Id.* at 226.

The Fifth Circuit concluded that the aliens' "disabilities," coupled with the defendant's threats and deceptions, caused the aliens to remain with the defendant. *See id.* at 226, 227. Specifically, the court highlighted the aliens' lack of familiarity with the new country in which they found themselves, their inability to speak English, and their lack of resources with which they could have escaped. *See id.* at 226. In addition, the court pointed to the defendant's warning to the aliens that if they left his house, they would be apprehended by INS officials and deported. *See id.* Based on this evidence, the court explained, a reasonable jury was entitled to conclude that the aliens were held against their will. *See id.* at 227.

The evidence presented in this case, like that described in *Carrion–Caliz,* supports the jury's conclusion that Lu seized or detained Chen within the meaning of the Hostage Taking Act. Like the aliens in

*Carrion–Caliz,* Chen was frightened by her smugglers. Describing her transport from the PRC to New York City, Chen testified that she witnessed the snakeheads administer beatings to other aliens smuggled alongside her. One such beating occurred after a snakehead discovered that a hole had been "scooped out" next to a window in one of the safehouses where Chen and others stayed while making the trek across Canada. Believing that one of the aliens had dug the hole in an attempt to escape, the snakehead proceeded to beat the alien. Chen testified that watching the snakeheads' physical abuse of other aliens "scared" her.

Chen's fear carried over to the time she spent in New York City prior to being, in her words, "let go." After arriving in the United States, she and three other female aliens were taken to a New York City apartment. Chen remained in the apartment for twenty days, more than two weeks longer than any of the aliens who accompanied her. When asked at trial why she stayed there for so long, Chen replied that she "could not get [her] money ready." She explained that during the twenty-day period, she left the apartment only once. She was "very anxious" and "wanted to get out sooner." Throughout her testimony, Chen repeatedly referenced people "guarding" her during her time in the apartment. Like the hostages in *Carrion–Caliz,* Chen testified that she received threats during the twenty days she spent in the apartment. Chen testified that at one point during her stay, a person "came by" the apartment, asked why she was still there, and ultimately recommended that she be sold to a prostitution house if she could not pay her fee. Chen also found herself in a vulnerable position, much like the hostages in *Carrion–Caliz:* she had no money, spoke no English, and was unfamiliar with her surroundings in the United States. *See id.* at 226, 227.

Viewed in the light most favorable to the government, Chen's testimony was sufficient to prove that her fear of the snakeheads, coupled with her own "disabilities," caused her to remain in the New York City apartment against her will. *See id.* at 226.

## II. *Jury Instructions*

### A. *Standard of Review*

 Lu contends that the district court's instruction on the "seizure" or "detention" element of the hostage-taking counts was erroneous because it "took the issue of consent away from the jury." Both parties agree that because Lu failed to object below, he now bears the burden of showing that "the district court's charge amounts to plain error." *Schultz,* 333 F.3d at 413 (internal quotation marks and citation omitted).

> To establish plain error, a court must find 1) an error, 2) that is plain, 3) that affects substantial rights.... If an error meets these first three requirements, the Court engages in a fourth consideration: whether or not to exercise its discretion to correct the error. The plain error should be corrected only if it seriously affects the fairness, integrity, or public reputation of judicial proceedings.

*United States v. Keigue,* 318 F.3d 437, 441–42 (2d Cir.2003) (internal citations and quotation marks omitted)

### B. *The Merits*

 The crux of Lu's argument concerning the district court's instruction consists of rehashing his contention—rejected in Section I.B. above—that the smuggling agreements manifested the aliens' consent to be detained until their fees were paid. By specifically instructing the jury that the aliens' initial consent *did not* preclude a

finding of later seizure or detention, Lu argues, the district court "charged away" evidence of their consent. Lu's position is flawed.

The district court left to the jury the issue of consent. The district court advised the jury at the outset of its instruction on the hostage-taking counts that to "'seize' or 'detain' means to restrain, hold or confine a person ... against that person's will and *without that person's consent.*" (emphasis added.) At a later point in the charge, the court again described the prosecution's burden on the first element of the offense of hostage taking: "[T]he Government must prove beyond a reasonable doubt that the defendant mentally or physically restrained a person for a period of time *against that person's will.*" (emphasis added.) The court's instruction in this respect closely mirrored the language used by the Fifth Circuit in *Carrion–Caliz* and endorsed by us earlier in this decision. *See Carrion–Caliz,* 944 F.2d at 225 ("[A] hostage is 'seized' or 'detained' within the meaning of the Hostage Taking Act when she is held or confined against her will for an appreciable period of time."). In elaborating on the issue of "consent," the district court properly advised the jury that "the hostage taking statute does not require that the seizure or detention of a person be against their will from the inception." Again, this language parallels that used by the Fifth Circuit in *Carrion–Caliz, see id.* at 226 ("[T]hat the hostage may initially agree to accompany the hostage taker does not prevent a later 'seizure' or 'detention' within the meaning of the Hostage Taking Act."), and is consistent with cases decided under

the Federal Kidnapping statute, *see Eagle Thunder,* 893 F.2d at 952; *Wesson,* 779 F.2d at 1444.

■ In his opening brief, Lu complains that the jury *could* have understood the district court's "detention" instruction to mean that "the alien's prior agreement was only to be conveyed to the United States, and that any prior consent to being held until fees were paid was irrelevant in the face of any subsequent mental or physical restraint." Implicit in Lu's argument is the notion that the court *should have instructed* the jury—on its own and without proposed language from Lu—that the aliens could have consented to their subsequent restraint in New York by virtue of their earlier smuggling agreement. We have held, however, that a defendant may not dictate the precise language of a court's instruction. *See United States v. Han,* 230 F.3d 560, 565 (2d Cir.2000). Moreover, as other courts have recognized, a defendant is not entitled to an instruction commenting or "marshaling" the evidence in a particular way. *See, e.g., United States v. Holley,* 502 F.2d 273, 276 (4th Cir.1974) ("[I]t is certainly not error that [the court] fails to marshal the evidence in the sense, commonly meant, of summarizing all of it."); *see also* 2A Charles Alan Wright, *Federal Practice and Procedure* § 488, at 401 (3d ed.2000) (noting that "a federal judge is not required to comment on the evidence").

The court's instruction did not prohibit the jury from considering the smuggling agreements and/or from finding that the aliens consented to be detained through those agreements.[2] While the instruction

---

**2.** Although Lu claims that he is not trying to "enforce" the smuggling agreements, his suggestion that those agreements "negate" the detention element of a hostage-taking violation seeks to do just that. Because alien smuggling agreements are illegal and unen-

forceable, *see United States v. Fan,* 36 F.3d 240, 245 (2d Cir.1994), where a defendant causes an alien such as Chen to remain in one location against her will when she would have preferred to be elsewhere, that defendant cannot insulate himself from criminal liability by

*did* advise the jury that the aliens' initial consent did not preclude a finding of later seizure or detention, it left for the jury to determine whether there was consent in the first instance and, if there was, whether and how it bore on the aliens' later detention. Because the instruction "provided the jury with an intelligible and accurate portrayal of the applicable law," *United States v. Weintraub*, 273 F.3d 139, 151 (2d Cir.2001), we find no error.

### III. *Leadership Enhancement under U.S.S.G. § 3B1.1(a)*

#### A. *Standard of Review*

■ A district court's imposition of an enhancement for a defendant's role as an organizer or leader under U.S.S.G. § 3B1.1(a) is subject to a mixed standard of review. Accordingly, we review the sentencing court's factual findings concerning the defendant's role for clear error. *See, e.g., United States v. Szur*, 289 F.3d 200, 218 (2d Cir.2002). The determination that those findings support an enhancement under section 3B1.1(a), however, represents a legal question, which we review *de novo. See, e.g., United States v. Paccione*, 202 F.3d 622, 624 (2d Cir.2000) (per curiam).

#### B. *The Merits*

■ Section 3B1.1(a) provides for a four-level increase in offense level "[i]f the defendant was an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a) (2001). Prior to imposing a leadership enhancement under section 3B1.1(a), a sentencing court must make "specific factual findings that (i) the defendant was an organizer or leader, and (ii) the criminal activity involved five or more participants, or was otherwise extensive." *United States v. Escotto*, 121 F.3d 81, 85 (2d Cir.1997) (collecting cases).

■ Although the criminal activity at issue must involve five or more participants or be otherwise extensive, the Sentencing Guidelines only require that the defendant be an organizer or leader of one or more of those participants for the section 3B1.1(a) enhancement to be appropriate. *See United States v. Zichettello*, 208 F.3d 72, 107 (2d Cir.2000) (noting that defendants "are subject to [section 3B1.1(a)'s] enhancement even if they each managed only one other participant, not five" (citing U.S.S.G. § 3B1.1, cmt. n. 2.)). A "participant" for the purposes of an offense-role enhancement is someone "who is criminally responsible for the commission of the offense," but that person "need not have been convicted." U.S.S.G. § 3B1.1, cmt. n. 1. We have held that in calculating whether there are five participants, the defendant may properly be included as one of the five. *See Paccione*, 202 F.3d at 625.

■ It is unclear whether Lu challenges the district court's finding regarding the number of participants involved in the hostage-taking conspiracy. At sentencing, the district court noted that it "agreed with the parties that the criminal activity did involve five or more participants." To the extent that Lu has raised this issue, his challenge is without merit. The district court's finding that Lu, Xin Ping, Zhong Ping, Yi Ming Li, Ben Yong Zhang, Long Jei, Fei Jei and Japanese

relying on an illegal, unenforceable agreement to furnish the alien's consent. *Cf. United States v. King*, 840 F.2d 1276, 1283 (6th Cir.1988) ("The Western legal tradition prohibits contracts consenting in advance to suffer assaults and other criminal wrongs. They are void as against public policy. *See Restatement (Second) of Torts* §§ 191, 195 (1981) (promise involving commission of tort invalid).").

Boy were all knowing participants in the hostage-taking conspiracy accurately reflects Li's trial testimony. The finding that five or more participants were involved was not clearly erroneous.

 Lu *does* argue that the findings supporting the district court's conclusion that he was an "organizer or leader" are clearly erroneous. Determining whether a defendant's role in an offense constitutes that of an organizer or leader requires that we examine "the degree of discretion exercised by him, the nature and degree of his participation in planning or organizing the offense, and the degree of control and authority exercised over the other members of the conspiracy." *United States v. Beaulieau*, 959 F.2d 375, 379–80 (2d Cir.1992). Our cases recognize that "one conspirator's leadership role is not dispositive on the question of whether another was also a leader." *United States v. Duncan*, 42 F.3d 97, 106 n. 6 (2d Cir.1994) (citing U.S.S.G. § 3B1.1, cmt. n. 4); *see United States v. Garcia*, 936 F.2d 648, 656 (2d Cir.1991) ("[E]ven if [the appellant's co-defendant] were an organizer, the district court would not be precluded from finding [appellant] to have been an organizer as well.").

At sentencing, the district court provided detailed factual findings in support of its conclusion that Lu was a leader or organizer in the hostage-taking conspiracy. For instance, the court noted that when Ping departed for China, he specifically tabbed Lu as the "boss" in charge of the New York base of operations. Although· such a label is not necessarily controlling under the Sentencing Guidelines, *see* U.S.S.G. § 3B1.1, cmt. n. 4, the evidence presented at trial demonstrates that Lu's title was well deserved, as he exercised substantial control over the New York end of the hostage-taking enterprise. According to Li's testimony, Ping told Li to contact Lu if he "needed anything," an instruction that Li took to heart. Every time a group of aliens arrived in New York City from Canada, Li would contact Lu to find out (i) who the aliens belonged to, and (ii) whether the aliens had paid their money. Referencing a master list that he and Ping maintained, Lu would determine whether the aliens were customers of his or Ping's. *Cf. United States v. Valdez*, 16 F.3d 1324, 1335 (2d Cir.1994) (affirming enhancement for defendant's leadership role where, among other things, defendant maintained organization's records). If the aliens belonged to Lu, he would direct Li to deliver them to Lu's home or keep them at Li's apartment, depending on the circumstances.

The evidence ·showed that Lu exercised his substantial discretion in other ways. For example, he recruited Fei Jei as an accomplice to assist him in guarding those aliens belonging to Lu while they made arrangements for payment of their fees. *See, e.g., Szur*, 289 F.3d at 218 (affirming district court's imposition of leadership enhancement where defendant, *inter alia*, recruited accomplices); *United States v. Espinal*, 981 F.2d 664, 668 (2d Cir.1992) (same). Moreover, when the first two groups of aliens arrived in New York City, it was Lu who provided Li with the $60,000 to pay Long Jie, who had transported the aliens from Canada, despite those particular aliens being customers of Ping's. *Cf. Valdez*, 16 F.3d at 1335 (affirming role enhancement under section 3B1.1(a) where court found that the defendant had, among other things, "disbursed money for bills" in drug operation). Lu's providing funding for customers that did not belong to him is .suggestive of the larger role he played in the conspiracy.

Lu also gave orders to various participants working under him. He instructed the guards at Li's apartment to intimidate

and threaten the aliens in order to expedite their payment of the smuggling fees. He also directed Li to rent a basement in which to hold the aliens until their fees were paid. Lu's role as a leader in the hostage-taking enterprise took more direct forms as well. Li testified that, on one occasion, Lu went to Li's home to make phone calls to some of the aliens' relatives to inform them that if they did not pay quickly, their loved ones would be beaten. Further, after arranging for Chen's release, it was Lu who accepted the $15,000 ransom payment, while another snakehead delivered Chen to her relatives in Chinatown.

In arguing that the four-level enhancement is undeserved, Lu describes a number of tasks necessary to the success of the smuggling operation in which he was not involved, such as renting the boat and guarding the aliens throughout their journey from the PRC to New York. He also makes frequent reference to Ping's significant involvement in the smuggling operation and Lu's instructing Li to contact Ping for directions concerning certain customers. At best, Lu's arguments suggest that there were others who played leading roles in the hostage-taking enterprise as well. As noted above, this is not dispositive of whether Lu played a leading or organizing role. *See Duncan*, 42 F.3d at 106 n. 6.

We conclude that the district court's findings are fully supported by the trial record, Li's testimony in particular. Those findings provide sufficient support for the district court's conclusion that Lu "exercised significant decision-making authority and control over the vital New York end" of the hostage-taking enterprise. The imposition of the four-level enhancement, therefore, was proper.

## CONCLUSION

The judgment is affirmed.