**UNITED STATES of America, Appellee**

v.

**Hung Shun LIN, a/k/a Chang Wu, Appellant.**

**Nos. 95–3164, 95–3172.**

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 15, 1996.

Decided Dec. 10, 1996.

As Amended Jan. 28, 1997.

Sandra G. Roland, Assistant Federal Public Defender, Washington, DC, argued · the cause, for appellant Hung Shun Lin, with whom A.J. Kramer, Federal Public Defender, Washington, DC, was on the briefs.

Cynthia M. Lobo, appointed by the Court, Washington, DC, argued the cause and filed the brief, for appellant Qiu Gao.

Jeanne M. Hauch, Assistant United States Attorney, Washington, DC, argued the cause, for appellee, with whom Eric H. Holder, Jr., Washington, DC, United States Attorney, John R. Fisher, Washington, DC, and Roy W. McLeese, III, Washington, DC, Assistant United States Attorneys, were on the briefs.

Before: WALD, WILLIAMS and TATEL, Circuit Judges.

WALD, Circuit Judge:

On April 13, 1995, appellants Hung Shun Lin ("Lin") and Qui Gao ("Gao") were convicted by a jury of hostage-taking, in violation of 18 U.S.C. § 1203. Lin was also convicted of two counts of using or carrying a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c), and possession of a firearm by an illegal alien, in violation of 18 U.S.C. §§ 922(g)(5) and 924(a)(2). On appeal, both appellants challenge the application of the Hostage Taking Act to the conduct underlying their indictment and contend that, even if the Act properly applies, there was insufficient evidence upon which a jury could base a conviction. They also argue that the district court impinged on their Sixth Amendment rights by limiting cross-examination of a government witness and improperly elicited testimony bolstering the credibility of government witnesses. Appellant Lin also contends that his convictions for using or carrying a gun under 18 U.S.C. § 924(c) should be reversed due to an erroneous jury instruction.

We find that the facts of this case fall within the plain language of the Hostage Taking Act and the jury was presented with sufficient evidence to support its conclusion that Lin and Gao seized or detained and threatened to injure or to continue to detain two hostages in order to compel a third person to pay money for the hostages' release, in violation of 18 U.S.C. § 1203. The court's limitation on the cross-examination of government witness Guan Huan Chen was not an abuse of discretion because defense

counsel did not demonstrate a reasonable basis for asking highly prejudicial cross-examination questions. Although we are troubled by a volunteered statement uttered by a law enforcement officer after the court asked him some clarifying questions, we conclude that the statement did not prejudice appellants. We do find, however, that the district court's instruction on the meaning of "use" under 18 U.S.C. § 924(c) was clearly erroneous under the standard subsequently set forth by the Supreme Court in *Bailey v. United States*, — U.S. ——, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995), and was prejudicial to appellant Lin. Accordingly, we affirm appellants' convictions, except Lin's convictions under § 924(c), which we reverse. We remand Lin's case for resentencing in light of these reversals.

## I. BACKGROUND

Testimony at trial established that on or about January 21, 1994, appellant Lin, appellant Gao, Hung T'ien Gao and one other man were admitted into a Chinatown building located at 501 L Street, N.W., by Sheng Chen ("Chen"). The men questioned Chen about whether he knew Chan Kan in China and then followed him up to the third floor apartment where he and Zhao Qui Li ("Li") lived. At least two of the four men who entered the apartment had guns. Once upstairs, appellant Lin and Hung T'ien Gao renewed their interrogation and asked Chen and Li whether they had tapped telephone wires in order to make phone calls to China. During the questioning, appellant Lin hit Chen.

The four intruders took Chen and Li out of the apartment building at gunpoint. The group stopped briefly at a house near 5th and M Streets, N.W., and then took Chen and Li to appellants' own residence at 10 N Street, N.W. The two hostages were handcuffed together and beaten with fists, wooden poles and a plastic block. During the beating they were interrogated about whether they had tapped telephone wires in order to make telephone calls to China. Chen admitted that he had tapped a phone line so that his calls would be billed to the tapped line. The captors demanded $10,000 from their captives for reimbursement of the telephone

charges. Chen and Li claimed they could not come up with such a large sum of money. The captors insisted "[i]f you don't have the money, you can ask some of your relatives to borrow money—to guarantee." Transcript ("Tr.") at 623; *see id.* at 471. Chen mentioned Guan Huan Chen as a possible source of funds. Li was escorted to a pay phone where he called the apartment at 501 L Street, N.W., from which he had been taken and asked a woman named Liu Hai to contact Guan Huan Chen, who lived on the second floor at 501 L Street, N.W.

Liu Hai paged Guan Huan Chen, who went to the third floor apartment where the incident began and was given the details of what had transpired. He was told by one of the eyewitnesses that the intruders were gambling parlor operatives, Tr. at 273, so he went to a gambling parlor at 514 M Street, N.W., to speak with a man nicknamed "Stupid Brother," reportedly the boss of the four intruders. When he entered the gambling parlor he encountered appellant Gao, who denied that he was involved in the seizure of Chen and Li. Guan Huan Chen found "Stupid Brother" and asked him to have his people release Chen and Li. "Stupid Brother" said the man responsible for the seizure of Chen and Li was Hung T'ien Gao, so Guan Huan Chen located an associate of Hung T'ien Gao nicknamed "No Teeth." "No Teeth" told Guan Huan Chen to wait at New York Avenue and N Street, N.W., where he would be contacted by the hostage takers. He was later contacted at that location and taken to the house where Chen and Li were being detained.

On arrival, Guan Huan Chen saw appellant Lin, Hung T'ien Gao and some other men in the house. The two hostages were kept out of view in the basement. Shortly thereafter appellant Gao arrived at the house. Guan Huan Chen asked the captors not to hurt Chen and Li and said "[s]o why not just set them free first. We talk things out later." Tr. at 281. Hung T'ien Gao protested that Chen and Li had made telephone calls on another person's phone line without paying the bill. Hung T'ien Gao raised the issue of payment by Guan Huan Chen and the men proceeded to negotiate an amount. After

some time the captors agreed that Chen and Li would be released in exchange for $5,800. The captors permitted Guan Huan Chen to talk to the two hostages over walkie-talkie so he could tell them what was going on, and that he expected them to repay him. When a sum was agreed upon, Chen and Li were produced from the basement. The two captives paid $800 of their own money to the hostage takers on release. During the next five days Guan Huan Chen paid the hostage takers the rest.

Over two months after these events, Guan Huan Chen contacted the Federal Bureau of Investigation ("FBI") and the Immigration and Naturalization Service and recounted the hostage-taking incident. Neither the hostage takers nor the hostages are United States nationals. The FBI executed a search warrant at 10 N Street, N.W., where they found wooden poles. The FBI also executed a search warrant at 1510 6th Street, N.W., a residence that appellants had moved to after the hostage-taking incident. There the FBI found a closed circuit television system, a gun, ammunition, handcuffs and walkie-talkies.

On May 31, 1994, a grand jury returned an indictment charging Lin, Gao and Hung T'ien Gao with two counts of hostage taking, in violation of 18 U.S.C. § 1203, two counts of using or carrying a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c)(1), and one count of possession of a firearm by an illegal alien, in violation of 18 U.S.C. §§ 922(g)(5) and 924(a)(2). Co-defendant Hung T'ien Gao pled guilty to hostage taking and possession of a firearm by an illegal alien. Appellants Lin and Gao went to trial on March 22, 1995. Both Lin and Gao were convicted of hostage taking. In addition, Lin was convicted of two counts of using or carrying a firearm during a crime of violence and of possession of a firearm by an illegal alien. These appeals ensued.

## II. DISCUSSION

### A. *Application of the Hostage Taking Act to Lin and Gao's Actions*

The Hostage Taking Act provides, in relevant part:

(a) Except as provided in subsection (b) of this section, whoever, whether inside or outside the United States, seizes or detains and threatens to kill, to injure, or to continue to detain another person in order to compel a third person or a governmental organization to do or abstain from doing any act as an explicit or implicit condition for the release of the person detained, or attempts to do so, shall be punished....

\*     \*     \*     \*     \*     \*

(b)(2) It is not an offense under this section if the conduct required for the offense occurred inside the United States, each alleged offender and each person seized or detained are nationals of the United States, and each alleged offender is found in the United States, unless the governmental organization sought to be compelled is the Government of the United States.

18 U.S.C. § 1203. Appellants argue that their convictions under the Hostage Taking Act should be overturned because their actions took place entirely in the District of Columbia, did not constitute international acts of hostage-taking and did not involve the United States government.

Application of the Hostage Taking Act, however, depends in part on the offender's and the victim's nationality. True, appellants' actions would not be punishable under the Hostage Taking Act if each offender and each detainee was a United States national. Add one non-national into the mix, however, and the Act on its face applies. *United States v. Lopez–Flores,* 63 F.3d 1468, 1471–72 (9th Cir.1995), *cert. denied,* — U.S. —, 116 S.Ct. 794, 133 L.Ed.2d 743 (1996). In this case, both the offenders and the victims were non-nationals.

■■■ Appellants argue that the mere involvement of a non-national in a hostage-taking crime does not warrant application of 18 U.S.C. § 1203 because the Hostage Taking Act was never intended to cover a garden variety domestic kidnaping. Nevertheless, "it is elementary in the law of statutory construction that, absent ambiguity or unreasonable result, the literal language of the statute controls and resort to legislative his-

tory is not only unnecessary but improper." *United States v. Yunis*, 681 F.Supp. 896, 904 (D.D.C.1988) (quoting *Eagle–Picher Indus., Inc. v. EPA*, 759 F.2d 922, 929 n. 11 (D.C.Cir. 1985)), *aff'd*, 924 F.2d 1086 (D.C.Cir.1991). There is no ambiguity here. While appellants correctly note that the specific facts of this case could as well have supported charges under local District of Columbia law, that is not the issue; the issue is whether the Hostage Taking Act clearly encompasses the conduct in this case. Unfortunately for appellants, the plain terms of the statute set out the essential elements of a hostage taking as (1) seizure or detention of another person, and (2) threatening to kill, injure, or continue to detain that person, (3) with the purpose of compelling a third person or governmental organization to do or abstain from doing something in order to obtain the release of the person detained. *See United States v. Carrion–Caliz*, 944 F.2d 220, 223 (5th Cir.1991), *cert. denied*, 503 U.S. 965, 112 S.Ct. 1573, 118 L.Ed.2d 217 (1992). The crime charged here meets all those tests.

■ Moreover, the statute's history does not undermine the application of the Act to the facts of this case. Congress enacted the Hostage Taking Act to implement the International Convention Against the Taking of Hostages, U.N. GAOR, Supp. No. 39, at 23, U.N.Doc. A/34/39 (1979), to which the United States became a signatory in 1979. *See* H.R. CONF. REP. NO. 1159, 98th Cong., 2d Sess. 418 (1984), *reprinted in*, 1984 U.S.C.C.A.N. 3710. Article 13 of the Convention, which exempts most purely domestic hostage takings, provides "[t]his Convention shall not apply where the offense is committed within a single State, the hostage and the alleged offender are nationals of that State and the alleged offender is found in the territory of that State." Hostage Taking Convention, art. XIII, T.I.A.S. No. 11081 (cited in *United States v. Lopez–Flores*, 63 F.3d at 1473 n. 2). Obviously, the exception to the Hostage Taking Act for domestic incidents tracks the same exception in the Convention. In drafting the statute then, Congress chose to conform domestic law · with the International Convention Against the Taking of Hostages, which permits prosecution of hostage takers who commit the offense within a single State,

and are not nationals of that State. The statute, in sum, reflects an unmistakable congressional intent to authorize prosecution of individuals such as appellants Lin and Gao.

### B. *Sufficiency of the Evidence Supporting Lin and Gao's Convictions Under the Hostage Taking Act*

■ Appellants argue that the evidence introduced at trial was insufficient to prove that their conduct was undertaken with any intent to force a third party to act. Appellants insist that the circumstances that the money exchanged for the release of the victims was in the nature of a "debt" and that the offenders sought to collect it from the debtor-victims, not a third party, serves to vitiate the guilty verdict. In analyzing a claim of insufficient evidence to support a conviction, our review is confined to the question "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Washington*, 12 F.3d 1128, 1135–36 (D.C.Cir.) (emphasis in original) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)), *cert. denied*, —— U.S. ——, 115 S.Ct. 98, 130 L.Ed.2d 47 (1994).

■ In order to convict a defendant of hostage taking in violation of 18 U.S.C. § 1203, a jury must find that the defendant "seize[d] or detain[ed] a person" and "threaten[ed] . . . to continue to detain" that person in order to compel a "third person" to do something as a condition for the release of the hostage. 18 U.S.C. § 1203(a). Appellants' assertion that they were seeking to collect a debt rather than to extort money is not relevant under the Act. The terms of the Act apply broadly to hostage takers seeking to compel the third person "to do . . . *any act*," *id.* (emphasis added); the statute does not differentiate between the various motivations that might prompt a person to take hostages in order to compel action by a third person. Moreover, if debt collectors were routinely excepted from the application of criminal prohibitions imposed on the rest of us, a significant number of our citizens

would spend day and night in fear of attack and capture, a consequence with disastrous implications for our social fabric and our economy.

Appellants accurately point out that the evidence at trial indicates that appellants initially sought to obtain money from their captives rather than from a third person. Faced with professions of poverty by the captives, however, appellants did not abandon their plan. Instead, they tried to get the hostages to think of someone who might lend them money and then summoned that person to the scene. That reaction on the captors' part was responsible for bringing a third person into the transaction. Once Guan Huan Chen arrived at the house and faced the captors, he asked "[w]hy not just set [Chen and Li] free first. We talk things out later." Tr. at 281. Appellants did not release Chen and Li at that time. Instead, negotiations concerning the price for their release were commenced. It was not until a sum was agreed upon that the hostages were brought up from the basement where they had been held. Guan Huan Chen promised that if he were permitted to take Chen and Li home, he would return and pay the money at a later date. At the time of their release, the two hostages paid $800 of their own to their captors. Guan Huan Chen paid $5,000 more to Lin during the five days after Chen and Li were released. A rational trier of fact, considering the evidence in the light most favorable to the government, would have no trouble finding beyond a reasonable doubt that appellants detained Chen and Li and threatened to keep detaining them until Guan Huan Chen promised to pay money for their release.

## C. *Prohibited Cross–Examination*

Appellant Lin argued at trial that he was targeted by the government's witnesses, principally Guan Huan Chen, because he worked for a Chinatown gambling parlor in competition with Guan Huan Chen's own gambling parlor. In cross-examining Guan Huan Chen, Lin's counsel attempted to impeach him by asking whether he was involved in a Chinatown gambling business. When the government objected to the question on relevance grounds, the court requested a proffer. Lin's attorney claimed that the question went to bias and motive to lie, arguing that Guan Huan Chen and others sought to remove Lin from the Chinatown gambling scene. He asserted that Guan Huan Chen "is involved in a number of shady businesses." Tr. at 357. Urged by the court to show "some basis" for the allegation, Lin's attorney explained that the only witness he had was his client. The court offered to hold a hearing on the matter outside the presence of the jury, but defense counsel would not accede to his client taking the stand. The court ruled that the proffer was not sufficient to form a good faith basis upon which to initiate a highly prejudicial line of cross-examination. Lin's counsel raised the issue again with the court the following morning when he moved for a mistrial. The court denied the mistrial motion and explained that defense counsel was free to recall the witness if and when he provided the court with a proffer demonstrating that he had a good faith basis for the line of questioning.

■ Appellant Lin claims that the court's decision impinged upon his Confrontation Clause rights under the Sixth Amendment. We disagree. The Confrontation Clause "does not bar a judge from imposing reasonable limits on a defense counsel's inquiries." *United States v. Derr*, 990 F.2d 1330, 1334 (D.C.Cir.1993). District courts "enjoy[ ] wide discretion to control cross-examination." *Harbor Ins. Co. v. Schnabel Found. Co., Inc.*, 946 F.2d 930, 935 (D.C.Cir.1991), *cert. denied*, 504 U.S. 931, 112 S.Ct. 1996, 118 L.Ed.2d 592 (1992). Accordingly, "Confrontation Clause violations are found primarily where defendants have been given *no* realistic opportunity to ferret out a potential source of bias." *United States v. Derr*, 990 F.2d at 1334 (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986)) (emphasis in original); *see also Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S.Ct. 292, 294, 88 L.Ed.2d 15 (1985) ("Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.").

The court's decision to limit cross-examination of Guan Huan Chen did not amount to an abuse of discretion. While bias is always a relevant subject for cross-examination, *United States v. Abel,* 469 U.S. 45, 52, 105 S.Ct. 465, 469, 83 L.Ed.2d 450 (1984), "counsel must have a reasonable basis for asking questions on cross-examination which tend to incriminate or degrade the witness and thereby create an unfounded bias which subsequent testimony cannot fully dispel." *United States v. Sampol,* 636 F.2d 621, 658 (D.C.Cir.1980) (citing *United States v. Fowler,* 465 F.2d 664, 666 (D.C.Cir.1972)). The general rule in such situations is that "the questioner must be in possession of some facts which support a genuine belief that the witness committed the offense or the degrading act to which the questioning relates." *United States v. Fowler,* 465 F.2d at 666.

When we consider appellant's proffer in light of these standards, we must uphold the district court's limit on this line of cross-examination. The questioning that Lin's attorney sought to pursue would imply that the witness was involved in illegal activities, and thus would have been highly prejudicial. When confronted by the judge's demand for a proffer to support such questioning, defense counsel made vague allusions to "shady businesses" and the witness's motive to lie. Pressed, defense counsel said that his only source for the allegation was his client. That proffer was too ambiguous to demonstrate that cross-examination about gambling parlors had any potential for proving that Guan Huan Chen's testimony was colored by a motive to lie. *Cf. United States v. Derr,* 990 F.2d at 1334. Lin's attorney never made any additional effort to show that the proposed line of cross-examination followed a lead reasonably suggested by other facts in evidence. *See United States v. Fowler,* 465 F.2d at 668 (Robb, J., concurring).[1]

Indeed, the court attempted to provide defense counsel with several opportunities to justify the cross-examination. The court offered to hold a hearing out of the presence of the jury, appeared ready to hear evidence other than the testimony of the defendant, and explicitly stated that it would permit Guan Huan Chen to be recalled to the stand if defense counsel could provide a better proffer. Lin's attorney rejected each of these options and did not raise the matter again with respect to any other witness. On these facts the court acted within its discretion to limit the cross-examination of Guan Huan Chen.

Our conclusion concerning the barring of cross-examination in this case does not narrow the very wide latitude that should be accorded defense counsel in a criminal case where prior discovery is necessarily limited. As we stated in *United States v. Fowler,* 465 F.2d at 666, "a reasonable amount of exploratory questioning should be allowed ... especially when the Government's principal witness is involved." Highly prejudicial questioning of the sort proposed here, however, requires a reasonable grounding in fact.

### D. *Bolstering of Witness Credibility*

Appellant Lin called FBI Special Agent Gary Shepard in order to complete the impeachment of Chinese-speaking government witnesses whose testimony at trial introduced details that had not been mentioned to law enforcement officers during the investigation of the hostage taking. On cross-examination by the government, Agent Shepard suggested that the witnesses' omissions during interviews with FBI agents may have been due to the fact that the interviews were conducted through interpreters. The trial court addressed several questions to Agent Shepard on this topic and elicited testimony from the agent that the first interview with a witness often does not draw out all of the pertinent facts. The following exchange then took place:

> Huan Chen's awareness of gambling houses in Chinatown, defense counsel launched an attack with the question "you are involved in running a gambling house yourself, isn't that right?" Tr. at 357.

---

1. Where counsel has only a very slight basis for her suspicions concerning a witness, she may ask non-accusatory questions designed to elicit the necessary underlying facts. *See id.* at 666. Defense counsel did not effectively use this method here. After a few general questions about Guan

Q: That happens generally? I mean, not specifically with respect to these people; is that a fair statement?

A: To be honest with you, I've found it to be more so in dealing with Chinese. They do not go beyond the scope of your question. They will answer your question. They'll be very polite, but they'll be very specific in answering your question. It's more of a specific language than what ours is.

Q: *But with the information that they do provide you, that that is basically accurate, is that what you are saying, the specifics they do provide you?*

[Gao's attorney] Ms. Lobo: Objection your honor.

Court: What's the basis of your objection?

Ms. Lobo: You are asking him to give an opinion about whether or not these witnesses tell the truth.

Court: No. I'm asking him about his experience. How long have you been with the FBI?

A: Seventeen years.

Q: How long have you been dealing with these ethnic investigations?

A: Since 1980 I've either been assigned counter terrorism investigations or organized crime investigations.

Q: I'm talking about investigations involving people who have a language problem.

A: Since 1980.

Q: Since 1980. *What I am trying to get at is, is the problem that you mention one in which it is a problem of people not volunteering additional information as opposed to the reliability of the information they do provide you?*

A: Some of it is the providing of additional information, in other words, going beyond the boundaries of the question asked, and some of it is the order in which the information is provided.

Q: Okay. Thanks.

A: *However, all of the information that we've got from witness to witness, there are some basic facts that never changed, and the results of our searches confirmed what the witnesses told us.*

Q: Thank you.

Tr. at 1038–40 (emphasis added).

▪ Appellants object to the highlighted portions of the colloquy because, they contend, the statements bolstered the government's Chinese witnesses' credibility. "Determinations of credibility are for the jury, not for witnesses." *United States v. Richter*, 826 F.2d 206, 208 (2d Cir.1987) (internal citations omitted). Therefore, it would be error for a judge to induce a witness to testify that another witness is truthful. *See United States v. Barbour*, 420 F.2d 1319 (D.C.Cir.1969); *cf. United States v. Boyd*, 54 F.3d 868, 871 (D.C.Cir.1995). Nevertheless, "cases addressing claims of improper judicial questioning have established that a trial judge is not a 'mere moderator,' but rather is charged with assisting the inexperienced laypersons who will render a verdict in understanding the nature and import of the often complex and always conflicting evidence presented at trial." *United States v. Duran*, 96 F.3d 1495, 1506 (D.C.Cir.1996). We consider the district judge's questions under an abuse of discretion standard.[2]

▪ Separated from context, the first of the two challenged questions by the judge

2. The government argues that the court should apply plain error review with respect to appellant Lin because his attorney did not voice an objection to the judge's question. We recently explained,

[a] hard and fast rule [limiting review to the plain error standard whenever a defendant fails to voice an objection voiced by a codefendant] could significantly complicate multi-defendant trials, and we decline to adopt it.... Where a judge does not indicate what her policy will be in express terms during a trial, we will consider objections raised by one

defendant to be preserved for other defendants if an examination of the record suggests that this was the approach taken by the judge in practice.

*United States v. Gatling*, 96 F.3d 1511, 1520–21 (D.C.Cir.1996). Both the government and appellants have provided the court with numerous citations to the record in order to demonstrate their understanding of the district court's policy in this case. We need not resolve this dispute, however, because even under the abuse of discretion standard, any error committed by the judge was harmless.

**770**

does indeed sound as if it sought assurance that the government's Chinese witnesses are truthful. Any error the judge may have committed in asking the question was harmless, however, because he immediately clarified that he was merely trying to understand how non-English speaking witnesses behave when interviewed by law enforcement officers. Moreover, Agent Shepard never actually answered the question, and the court instructed the jury at the close of trial that they were to disregard any perception that the judge had expressed any view on the merits, including any such perception caused by the judge's questioning of witnesses. The second challenged question was, essentially, an unobjectionable reformulation of the first challenged question. By our reading of the trial transcript, the judge's inquiries sought to clarify Agent Shepard's experience interviewing non-English speaking, Chinese witnesses during the investigative phase of a case, rather than to bolster or invite bolstering of the government witnesses' testimony. While the wording of the first challenged question was unfortunate, it is not likely that in the context of the exchange it had much impact on the jury. Certainly the judge's questions did not have a "substantial or injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S.Ct. 1710, 1721, 123 L.Ed.2d 353 (1993).

■ We next review Agent Shepard's final comment that his investigation uncovered facts consistent with the statements made by the government's witnesses. This remark was volunteered by Agent Shepard after the court completed its inquiry concerning his experience with non-English speaking witnesses. The remark was not invited by the court and could not reasonably have been anticipated in light of the question most recently posed to the agent by the court. Notwithstanding the absence of any objection or motion by either attorney at trial, appellants now argue that the court's error in allowing the comment requires reversal. Because

neither party objected to the statement's admission, it is reviewed under a plain error standard. In order for the court to determine that the district judge committed plain error, it must (1) have been error under settled law of the Supreme Court or of this circuit, and (2) have unfairly prejudiced the jury's deliberations. *United States v. Mitchell*, 996 F.2d 419, 422 (D.C.Cir.1993) (citations omitted).

■ Agent Shepard's remark does have the effect of bolstering the credibility of the government's Chinese witnesses, and we are critical of the volunteering by a law enforcement officer of testimony designed to bolster the government's case.[3] We cannot conclude, however, that it was plain error for the court not to *sua sponte* strike the remark or give a curative instruction limiting the effect of the comment. Defense counsel may have had strategic reasons for not objecting, such as a desire not to draw attention to Agent Shepard's comment.

Nor do we conclude that the remark unfairly prejudiced the jury's deliberations. We base our judgment upon our own reading of the record and what seems to us to have been the probable impact of the inappropriate statement on the minds of an average jury. Over the course of this three-week trial, the government presented the testimony of the two men who were taken hostage, Chen and Li, the man who negotiated for the release and put up money for the release, Guan Huan Chen, an eyewitness to the initial seizure, Jin Xin Lu, and cooperating co-defendant Hung T'ien Gao. Each of these witnesses testified about the events that took place. Chen, Li, Guan Huan Chen and Hung T'ien Gao all identified appellants as active participants in the hostage taking. Tr. at 275, 279, 479–80, 635–36, 718. When the government searched the location where the hostages allegedly had been kept and the residence occupied by appellants after the hostage taking, they found items described by the victims from the time of their deten-

---

**3.** Appellants also point to a remark by a different government witness and another remark by the judge in the record that they contend bolstered the testimony of government witnesses. Appellant's Brief at 37 n.11. Neither one of these

remarks was objected to and, at worst, both statements can be characterized only as innocuous mistakes. They certainly do not constitute plain error.

tion. The overwhelming weight of the evidence supports appellants' guilt. We recognize that appellants' defense was based on the theory that the entire incident was fabricated by business rivals in order to eliminate their competition in the Chinatown gambling market. But appellants have come up with no credible indication in the record to support that theory or explain why such a variety of witnesses, with different motivations, would all join together to finger these appellants and testify compatibly to the essential elements of the crimes underlying appellants' convictions. Because of the overwhelming evidence of guilt, we do not find that Agent Shepard's gratuitous comment could have had any substantial impact on the jury's deliberations.

### E.  Jury Instruction on "Use" of a Gun

The jury returned guilty verdicts against appellant Lin on two counts of using or carrying a firearm in relation to a crime of violence, in violation of 18 U.S.C. § 924(c). The district judge's instructions to the jury on these counts stated that if the jury found that Lin had "the firearm available to assist or aid in the commission of the crime," even if he did not "fire[ ] or even display[ ] a weapon," then a conviction would be permitted. Tr. 4/13/95 at 52. In *Bailey v. United States*, —— U.S. ——, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995), the Supreme Court held that a conviction under the "use" prong of 18 U.S.C. § 924(c) requires proof "that the defendant actively employed the firearm during and in relation to the predicate crime...." *Id.* at ——, 116 S.Ct. at 506. Mere possession of a weapon during the commission of a crime is insufficient to meet that standard. *Id.* at ——, 116 S.Ct. at 509.

Under the supervening-decision doctrine we may "consider any change ... in law[ ] which has supervened since the [trial court's] judgment was entered," so long as the law was so well-settled at the time of trial that any attempt to challenge it would have appeared pointless. *United States v. Washington*, 12 F.3d at 1138, 1139 (citations omitted). On that basis, we apply *Bailey* here to determine whether appellant Lin was prejudiced by the district court's erroneous jury

instructions. Indeed, the government concedes that the judge's instruction was erroneous under *Bailey* and that the jury could have convicted appellant Lin on a "use" theory without finding that he actively employed a gun. We agree and, therefore, reverse the convictions.

The government requests the court remand the case for resentencing on the remaining convictions, at which time the government will seek a two-level upward adjustment of Lin's sentences on his other convictions under § 2D1.1(b)(1) of the Sentencing Guidelines. *See* U.S.S.G. § 2D1.1(b)(1). Another panel of the court is currently considering the case of *United States v. Rhodes*, 62 F.3d 1449, in which it, *inter alia*, is examining whether, in light of 28 U.S.C. § 3582, the court may authorize the district court to resentence a defendant in the manner requested by the government. Section 3582 provides that sentences of imprisonment are final unless corrected or appealed and modified as "expressly permitted by statute." In *Rhodes*, the appellant argues that no statute expressly authorizes the court to add a two-level enhancement to the guidelines calculation on resentencing. We reverse Lin's § 924(c) convictions and remand the case to the district court for resentencing on the assumption that the district court will postpone resentencing appellant Lin until a decision has been issued in *United States v. Rhodes*, 62 F.3d 1449.

### III.  CONCLUSION

Appellants were properly charged under the Hostage Taking Act and there was sufficient evidence for the jury to convict them under the Act for detaining Chen and Li and threatening to detain them until a third party promised to pay money for their release. The court acted within its discretion in limiting cross-examination of government witness Guan Huan Chen because defense counsel did not proffer that he had a reasonable basis for the highly prejudicial line of questioning. The admission of a volunteered comment by Agent Shepard did not substantially affect the jury's verdict, and therefore is not grounds for a reversal. Appellant Lin's con-

victions under 18 U.S.C. § 924(c) must be reversed, however, because the trial judge's instruction permitted the jury to return a guilty verdict based on an interpretation of the statute that was subsequently foreclosed by the Supreme Court in *Bailey v. United States.* Accordingly, we affirm all·the convictions except Lin's convictions under § 924(c), and we remand the case to the district court for resentencing.

*So ordered.*