08-2805-cr(L)
U.S. v. Rodriguez, et al.

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term 2009

Heard: October 19, 2009          Decided: November 30, 2009

Docket Nos. 08-2805-cr (L), -2880-cr (CON)

- - - - - - - - - - - - - - - - - - - - -
UNITED STATES OF AMERICA,
        Appellee,

            v.

DOMINGO RODRIGUEZ and JORGE GARCIA-
REYNOSO,
        Defendants-Appellants.
- - - - - - - - - - - - - - - - - - - - -

Before: NEWMAN, CALABRESI, and KATZMANN, Circuit Judges.

Appeals from the June 2 and 3, 2008, judgments conviction of the United States District Court for the Eastern District of New York (Sandra J. Feuerstein, District Judge), sentencing the defendants, after a jury trial, for violating the Hostage Taking Act, 18 U.S.C. § 1203, and the Alien Transportation Act. 8 U.S.C. § 1324(a)(1)(A)(ii).

Convictions for violating the Hostage Taking Act reversed, convictions for violating the Alien Transportation Act affirmed, and cases remanded for resentencing.

                    Beverly Van Ness, New York, N.Y., for
                        Defendant-Appellant Rodriguez.

Edward V. Sapone, New York, N.Y., for Defendant-Appellant Garcia-Reynoso.

Nicole Boeckmann, Asst. U.S. Atty., Brooklyn, N.Y. (Benton J. Campbell, U.S. Atty., David C. James, Asst. U.S. Atty., Brooklyn, N.Y., on the brief), for Appellee.

JON O. NEWMAN, Circuit Judge.

In 1984 Congress enacted the Hostage Taking Act, Pub. L. No. 98-473, Title II, § 2002(a), Oct. 12, 1984, 98 Stat. 2186 (1984) ("the Hostage Act" or "the Act"), to implement the International Convention Against the Taking of Hostages, Dec. 18, 1979, T.I.A.S. No. 11,081 ("Hostage Convention"). See United States v. Wang Kun Lue, 134 F.3d 79, 81 (2d Cir. 1998). The Convention binds the signatories "to adopt 'effective measures for the prevention, prosecution and punishment of all acts of taking hostages as manifestations of international terrorism.'" Id. (quoting Hostage Convention). The principal issue on this appeal is whether the Hostage Act has been validly applied to defendants who perpetrated an extortion scheme that used brief confinement of a taxi passenger to obtain a somewhat above average taxi fare. Jorge Garcia-Reynoso and Domingo Rodriguez appeal from the judgments of the District Court for the Eastern District of New York (Sandra J. Feuerstein, District Judge), entered June 2 and 3, 2008, respectively, sentencing them primarily to 240 months' imprisonment after a jury found them guilty of violating the Hostage Act and

-2-

transporting an illegal alien for financial gain, in violation of 8 U.S.C. § 1324(a)(1)(A)(ii), (v)(I), (v)(II).

We conclude that the Hostage Act does not apply to the Appellants' offense conduct on the facts of this case. We therefore reverse Reynoso's and Rodriguez's convictions on the Hostage Act, affirm their convictions on the alien transportation counts, and remand their cases for resentencing.

## Background

On January 21, 2005, Azucena Gonzalez-Mendez ("Mendez"), a Mexican citizen, was smuggled across the border from Mexico into Arizona by a "coyote"[1] who had been hired by her husband, Julio Gabriel Lopez-Perez ("Perez"). Mendez had unsuccessfully attempted to enter the United States on two separate occasions earlier that same week. After being driven to Las Vegas on her third attempt, she flew to MacArthur Airport on Long Island, where she expected to meet her husband who was planning to come from his home in Asbury Park, New Jersey. She arrived at the airport in dirty clothes, muddy shoes, and with no luggage. Mendez does not speak English. When Mendez arrived at the airport, she could not find Perez. While waiting for him, defendant Rodriguez approached her and told her, in Spanish, that she

---

[1]In the taxonomy of alien smuggling, "coyote" is the term for those who facilitate unlawful entry from Mexico. Cf. "snakehead," the term for those who assist unlawful entry from China, see United States v. Si Lu Tian, 339 F.3d 143, 147 (2d Cir. 2003).

-3-

should go inside because it was cold.  Inside, Rodriguez told Mendez that it was unsafe for her to wait outside for Perez because the police parked in front of the terminal were from immigration. Rodriguez told her that if the police noticed her, she would be arrested.

Mendez tried to explain to Rodriguez that she was waiting for her husband to pick her up.  Rodriguez reiterated his warning about immigration officers.  Mendez was frightened, as she had been caught twice before by immigration officials and returned to Mexico. Rodriguez then asked Mendez if she had the phone number for the person who was supposed to meet her, and told her to give him the number so that he could call the person for her.  Mendez wanted to call Perez herself, but Rodriguez insisted that he would do it.  Mendez gave Rodriguez the number, and he purported to make a call from his cell phone.  He claimed that nobody answered.  Rodriguez then offered to give Mendez a ride, reiterating again that if she waited in the airport for too long, she would be arrested. Mendez believed Rodriguez's warning, and she agreed to go with him.

Rodriguez escorted Mendez to a van, being driven as a gypsy cab by defendant Reynoso.  Rodriguez told her to get in, which she did. Rodriguez then said that he was going back to the terminal to see if the person Mendez was waiting for had arrived.  After sitting in the van for about fifteen minutes, Mendez saw Perez in front of  the

terminal. Mendez told Reynoso that she saw her husband and that she wanted to get out of the van to meet him. Reynoso told her "no, no, no, because immigration is following us." Mendez was frightened by Reynoso's warning, so she remained in the van but asked Reynoso to call Rodriguez so that Rodriguez could tell Perez where she was. Reynoso agreed, but when he supposedly dialed Rodriguez's number, there was no answer. Even though Mendez could see her husband, she did not try to leave the van because she was afraid that she would get caught by immigration officials. Reynoso told Mendez that he would take her home, and she agreed. As she explained, "This was the first time I was in the U.S. [Reynoso] scared me, telling me that immigration was following us. So I had no other alternative but to say yes." Reynoso and Mendez left the airport without Rodriguez.

Reynoso and Mendez drove for a while and at some point stopped at a convenience store where Rodriguez joined them. Mendez did not try to leave the van. She explained that she was too afraid to get out, had no money, did not speak English, and did not know where she was.

Previously, Rodriguez had called the number that Mendez had given him and spoke with Alejandra Luna, whose family lived with Perez in Asbury Park. Rodriguez offered to take Mendez home, but Luna said that Perez was on his way to pick her up at the airport. Rodriguez insisted that he would bring Mendez home, but Luna repeatedly told him "no." Luna then called Perez and reached him while he was being

driven to MacArthur Airport. She gave Perez the number that had shown up on her caller ID when Rodriguez called her. The cell phone number where Luna reached Perez belonged to Edgar Carreon-Mancilla ("Mancilla"), whom Perez had hired to drive him to MacArthur Airport and then back to New Jersey. While driving to the airport, Perez tried to call the number Luna had given him, and after four attempts, Rodriguez finally answered the phone. Perez told Rodriguez who he was and asked about Mendez. Rodriguez claimed he was a Customs Service employee, and told Perez that he had seen Mendez and had directed her to a car because she could not wait around the airport for a long time.

Perez called Rodriguez again, explaining that he was desperate and nervous, but Rodriguez claimed that he did not know the person who Mendez left with. When Perez arrived at the airport, he looked for his wife but could not find her and left the airport after looking for about twenty minutes. Ten minutes from the airport, he called Rodriguez again. This time, Rodriguez told Perez that Mendez had left with a Mexican man who was driving her to New Brunswick, New Jersey.

Rodriguez then called Perez back, and arranged to meet him on the Long Island Expressway. Perez and Mancilla waited on the shoulder of the expressway for Rodriguez. Rodriguez arrived, shook hands with Perez, and said, "I want to take care of this." [GA 53] Rodriguez told Perez that he would try to get in contact with the person who was

driving Mendez. Rodriguez then advised Perez that he should "come to an arrangement" with the person driving Mendez to pay for her trip, and another man accompanying Rodriguez told Perez he was "sure [the driver] will take her to where you live." Rodriguez told Perez to call him after 7:00 p.m. to get the number for the man who was driving his wife.

After Rodriguez left, Perez repeatedly called Rodriguez, and when he finally got through, Rodriguez told Perez that he was with Mendez. Rodriguez briefly spoke to Perez and then gave the phone to Mendez. Mendez started crying when she heard her husband's voice, and, in her testimony, said that she was "terrified." Perez told Mendez that he would come get her, and Rodriguez then took the phone and told Perez to meet him at a gas station in the Monmouth Service Area on the Garden State Parkway in New Jersey.

Rodriguez, Reynoso, and Mendez arrived at the service area before Perez and Mancilla. Reynoso parked in an empty employee parking lot about 100 yards away from the gas station. Perez and Mancilla arrived at the gas station shortly after 9 p.m., and when they did not see appellants, they called them on a cell phone. Rodriguez directed Mancilla to drive towards the parking lot, and when he and Perez got close to the van, Rodriguez directed them to turn off the car lights. Mancilla parked his car in front of the van. Perez approached the van, in which he could see his wife and the two defendants.

When Mendez saw her husband, she got up to leave the van, but Rodriguez, in an angry and annoyed voice, shook his finger at her and told her "no, no, no, ma'am, wait.  You cannot get out until the driver speaks with your husband."  Mendez complied because she was frightened and did not leave the van.

Perez attempted to open the rear door to the van, but Rodriguez locked the door.  Perez then demanded that Rodriguez let Mendez out, but Rodriguez refused and told Perez that he "had to come to an arrangement with the driver."  Reynoso then got out of the van and told Perez, "[Y]ou have to pay me $475."[2]  Perez told Reynoso that he was not going to pay anything.  From inside the van, Rodriguez responded that if Perez did not pay, he would call the police.  Perez again told appellants that he would not pay and that he would call the police himself.  Rodriguez responded, "Okay, call.  We'll see who will be the loser."

Perez went back to the car and told Mancilla what happened.  Mancilla immediately called 911 and explained the situation.  The 911 operator received the call at 9:17 p.m.  Ten minutes later, three officers arrived on the scene from the New Jersey State Police.  As soon as they arrived, they spoke briefly with Perez and Mancilla  and then approached the van.  One officer opened the passenger door where

_____

[2]Perez was not sure whether the demand was $475 or $485.

Rodriguez was sitting, saw Mendez in the back seat, opened the rear door, and let her out of the van. The police arrested both Reynoso and Rodriguez.

The interval from the time Rodriguez told Perez that Mendez would be released only if he paid $475 until the police secured her release was no more than fifteen minutes, as the Government acknowledges, and during most of that interval, the defendants, Mendez, and Perez were waiting for the police to arrive.

Indictment and trial. A superceding indictment charged Rodriguez and Reynoso with conspiracy to commit hostage taking, see 18 U.S.C. § 1203 (Count One), the substantive offense of hostage taking, see id. (Count Two), kidnapping, see id. § 1201(a)(1) (Count Three), conspiracy to transport an illegal alien for commercial advantage, see 8 U.S.C. § 1324(a)(1)(A)(v)(I) (Count Four), and the substantive offense of transporting an illegal alien, see id. § 1324(a)(1)(A)(ii) (Count Five).

Prior to trial, the Government obtained the District Court's permission, pursuant to Fed. R. Evid. 404(b), to admit, solely against Rodriguez, evidence that in 1993, while driving a cab, he had helped to kidnap Marvin Portillo, a sixteen-year-old illegal alien at JFK airport. Portillo had arrived on a flight from Arizona after illegally entering the United States. Rodriguez drove Portillo to the home of Portillo's brother and demanded a sum of money far in excess

of what the cab fare should have been.  For that offense, Rodriguez pled guilty to attempted petit larceny and was sentenced to probation. Following the District Court's ruling, Reynoso unsuccessfully moved for severance, arguing that he would be prejudiced by Rodriguez's prior criminal history.  At trial, the District Court gave a limiting instruction that Rodriguez's 1993 offense was admissible only against Rodriguez and was admitted only on the issue of intent.

After a jury trial, the defendants were acquitted of conspiracy to violate the Hostage Act (Count One) and of kidnapping (Count Three), convicted of the substantive Hostage Act offense (Count Two), and convicted of the transportation of an illegal alien offenses (Counts Four and Five).

Sentencing.   The Presentence Report ("PSR") started the Guidelines calculation for both defendants with a base offense level of 32, see U.S.S.G. § 2A4.1 ("Kidnapping, Abduction, Unlawful Restraint"), added 6 levels for a ransom demand, see id. 2A4.1(b)(1), added 2 levels for a vulnerable victim, see id. § 3A1.1(b)(1), and 2 levels for obstruction of justice, see id. § 3C1.1.  The adjusted offense level of 42 in Criminal History Category I yielded a sentencing range of 360 months to life.  The District Court accepted the PSR's Guidelines calculation, but elected to impose a non-Guidelines sentence and sentenced each defendant to 240 months' imprisonment on Count Two (hostage taking) and concurrent sentences of

120 months' imprisonment on Courts Four and Five (conspiracy to transport and transporting an illegal alien for financial gain). The sentences also included five years of supervised release and a $300 special assessment.

## Discussion

The Appellants raise nine issues on appeal: (1) improper venue in the Eastern District of New York for the hostage taking conviction, (2) admission of Rodriguez's prior act evidence, (3) denial of Reynoso's motion to sever, (4) denial of Rodriguez's motion for mistrial based on a juror's apprehension, (5) denial of Rodriguez's motion for a mistrial based on evidence of Reynoso's incarceration,(6) insufficiency of the evidence for the hostage taking conviction, (7) impermissible vouching by the Government, (8) error in the charge on the elements of the transporting-an-alien counts, and (9) procedural and substantive sentencing errors. It will be convenient to consider first the challenge to the sufficiency of the evidence for the hostage taking conviction.

## I. Sufficiency of the Evidence to Violate the Hostage Act

Before considering, under the applicable standard, see Jackson v. Virginia, 443 U.S. 307 (1979), whether the evidence permitted the jury to find beyond a reasonable doubt that the Defendants violated the Hostage Act, we face the threshold issue of the applicability of the Hostage Act to the Defendants' conduct. The Defendants contend that

-11-

the Act may not be applied to what they characterize as essentially a taxi fare dispute.  In considering this issue, we note that the Defendants make no claim that the evidence was insufficient to support their substantive and conspiracy convictions for unlawful transportation of an alien.

Initially, it might be questioned whether the Hostage Act may be validly applied to any conduct that is not related to international terrorism.  The Conference Report on the Act makes clear that it "implements the International Convention Against the Taking of Hostages." See H.R. Conf. Rep. 98-1159, at 418, 1984 U.S.C.C.A.N. 3710, 3714.  The preamble to the Convention states that the Convention binds its signatories to adopt "effective measures for the prevention, prosecution and punishment of all acts of taking of hostages as manifestations of international terrorism." Convention, preamble, T.I.A.S. No. 11,081 (emphasis added).  President Reagan sent to Congress draft legislation that was the predecessor of the Hostage Act "[t]o demonstrate to other governments and international forums that the United States is serious about its efforts to deal with international terrorism."  See Message from the President of the United States Transmitting Four Drafts of Proposed Legislation to Attack the Pressing and Urgent Problem of International Terrorism, H.R. Doc. No. 98-211, 98th Cong., 2d Sess, at 3 (April 26, 1984).  As the Department of Justice has acknowledged, the offense created by the

Hostage Act "is defined in substantially the same manner as under the Convention." U.S. Department of Justice, <u>Handbook on the Comprehensive Crime Control Act of 1984 and Other Criminal Statutes Enacted by the 98th Congress</u> 199 (December 1984) ("Handbook"). Indeed, the Hostage Act did not become effective until the Convention came into force and the United States became a party to it. <u>See</u> 18 U.S.C.A. § 1203, Historical and Statutory Notes, Effective and Applicability Provisions; Handbook 200.

Furthermore, when this Court considered a constitutional challenge to the Hostage Act on the ground that the Convention itself was beyond the treaty power of Article II of the Constitution, we emphasized that "the Convention addresses a matter of grave concern to the international community: hostage taking as a vehicle for terrorism." <u>Wang Kun Lue</u>, 134 F.3d at 83. And we upheld the Hostage Act because it "plainly bears a rational relationship to the Convention." <u>Id.</u> at 84.

A scheme to detain a person in order to extort a taxi fare, even an excessive taxi fare, is not a "manifestation of international terrorism."

However, although the first case involving the Hostage Act arose out of a terrorist hijacking of an international flight, <u>see</u> <u>United States v. Yunis</u>, 924 F.2d 1086 (D.C. Cir. 1991), the case law that has developed under the Act has not limited it to conduct related to

-13-

international terrorism, and has applied it to several instances of confining illegal aliens and demanding payment for their release. See United States v. Tchibassa, 452 F.3d 918 (D.C. Cir. 2006); United States v. Si Lu Tian, 339 F.3d 143 (2d Cir. 2003); United States v. Ferreira, 275 F.3d 1020 (11th Cir. 2001); United States v. Fei Lin, 139 F.3d 1303, supplemented by United States v. Fei, 141 F.3d 1180 (9th Cir. 1988) (table); Wang Kun Lue, 134 F.3d at 81; United States v. Lopez-Flores, 63 F.3d 1468 (9th Cir. 1995); United States v. Carrion-Caliz, 944 F.2d 220 (5th Cir. 1991); see also United States v. Montenegro, 231 F.3d 389 (7th Cir. 2000) (confinement of aliens to demand payment for narcotics); United States v. Santos-Riviera, 183 F.3d 367 (5th Cir. 1999) (confinement of United States citizen infant to demand ransom for her release); United States v. Hung Shun Lin, 101 F.3d 760 (D.C. Cir. 1996) (confinement of aliens to demand payment of telephone bills).

Even though the case law has now established that a Hostage Act violation does not require a link to international terrorism, the original purpose of the statute serves as a frame of reference to caution against stretching the coverage of the Act. In the pending case, for example, the defendants' conduct undoubtedly violated the statute punishing the unlawful transportation of an alien, 8 U.S.C. § 1324(a)(1)(A)(ii), and perhaps other federal and state statutes. Whether their conduct violated the Hostage Act, however, requires

-14-

precise consideration of what the Government proved, measured against the elements of that offense.

To prove a violation of the Hostage Act, the Government must show that a defendant "(1) seized or detained another person, and (2) threatened to kill, injure, or continue to detain that person, (3) with the purpose of compelling a third person or governmental organization to act in some way, or to refrain from acting in some way." Si Lu Tian, 339 F.3d at 150 (citations omitted).  If the offense occurred inside the United States, the Act applies only if one defendant or the victim is an alien (unless the entity sought to be compelled is the United States). See  Santos-Riviera, 183 F.3d at 370 (alien status of offender or victim is affirmative defense).  As applied to the pending case, these elements required the Government to prove that the defendant "detained" Mendez and continued to detain her for the purpose of compelling her husband to pay the taxi fare of $475.  The jury was entitled to find that Mendez was detained in Garcia-Reynoso's taxi at the MacArthur Airport.  After seeing her husband, she said that she wanted to leave the taxi, but Rodriguez persuaded her not to leave by warning her of the risk of being picked up my immigration officers.  Although, as an undocumented alien who had just been smuggled into the United States, she feared that possibility before she entered the taxi, the defendants preyed on that fear, and "fear . . . can be sufficient to restrain a person against

-15-

her will." Carrion-Caliz, 944 F.2d at 225. The jury could also find that the defendants continued to detain Mendez at the service area for the purpose of compelling her husband to pay $475.

However, the case law interpreting the Hostage Act has required that a defendant confine a victim "'for an appreciable period of time.'" Si Lu Tian, 339 F.3d at 152 (quoting Carrion-Caliz, 944 F.2d at 225). This requirement derives from the Supreme Court's construction of the Federal Kidnaping Act, 18 U.S.C. § 1201. See Chatwin v. United States, 326 U.S. 455, 460 (1946) (construing predecessor statute, 18 U.S.C. § 408a (1940) ("The act of holding a kidnapped person for a proscribed purpose [i.e., held for ransom or reward or otherwise] necessarily implies an unlawful physical or mental restraint for an appreciable period against the person's will and with a willful intent so to confine the victim.")).

Whether Mendez was held, in violation of the Hostage Act, for an appreciable period of time requires identification of the relevant time period. The Government contends that the confinement of Mendez began at the MacArthur Airport, and the evidence clearly entitled to jury to so find. The approximately three-hour journey from the MacArthur Airport to the service area in New Jersey would qualify as an appreciable period of time, but although the start of that journey suffices to begin the conspiracy and substantive offenses of transporting an alien in violation of section 1324, it does not begin

-16-

the hostage taking offense.  That offense requires detaining and continuing to detain a person to compel a third person to do an act "as an explicit or implicit condition for the release of the person detained." 18 U.S.C. § 1203(a).[3]  The defendants did not try to compel Perez to pay money to obtain the release of his wife until he arrived at the Monmouth service area.  The confinement following the demand for payment lasted at most fifteen minutes.

At the earlier encounter between Rodriguez and Perez alongside the Long Island Expressway, Rodriguez urged Perez to "make an arrangement" with Reynoso, but, crediting Perez's account and drawing all reasonable inferences from his version of the conversation, the jury could not reasonably find that Perez was being urged to make an arrangement with Reynoso <u>for Mendez's release</u>. Rodriguez neither said nor implied anything to suggest that paying for the taxi ride was a condition for her release.  Indeed, Perez had no reason to think that his wife was then detained and never claimed that he then thought so. Detaining Mendez <u>for the purpose of compelling a third person to do an act as a condition for her release</u> did not occur until the demand for

_____

[3]Had the defendants told Mendez when they arrived at the service area that the fare was $475 and that she could not leave the van until she paid, and after an appreciable period of time she had handed them the money and left the taxi, there would not have been a violation of the Hostage Act in the absence of a demand upon a third person.  <u>See United States v. Hung Shun Lin</u>, 101 F.3d 760, 767 (D.C. Cir. 1996) (demand for money from confined victims did not become violation of Act until demand made upon third person).

payment was made at the service area.[4]  It might have been contended that even if the substantive offense did not occur until that point, the defendants earlier conspired to induce Mendez to enter the van by preying on her fear and did so with the ultimate intention of getting someone to pay them as a condition of her later release.  We need not consider whether, on that theory, the evidence would have supported a conspiracy conviction because the jury acquitted on the hostage taking conspiracy count.

Thus, the Hostage Act applies to the Defendants' conduct only if the interval from the time a demand was made upon Mendez's husband at the service area to secure his wife's release until Mendez got out of the taxi constitutes an "appreciable period of time."  In Si Lu Tian, the aliens were confined for twenty days. See 339 F.3d at 154. In Carrion-Caliz, the confinement lasted eight days. See 944 F.2d at 221. In Hung Shun Lin, the aliens were confined during a day and were beaten. See 101 F.3d at 764-65; In Santos-Riviera, the abduction of an infant lasted a few hours. See 183 F.3d at 368.  Even if the threshold for "appreciable period of time" should be somewhat diminished if the victim is injured or threatened with injury, or, like the infant in Santos-Riviera, is especially vulnerable to injury during confinement,

_____

[4]The Government makes no claim that at the encounter on the Long Island Expressway, Rodriguez made a demand that Perez do an act as a condition of his wife's release.

-18-

the fifteen minutes that Mendez was confined in the taxi at the service area, without any injury or threat of injury, is not sufficient to establish a Hostage Act violation, especially in view of the fact that during most of that interval the defendants, Mendez, and her husband were waiting for the arrival of the police whom they all knew had been called. Although ransom demanded to satisfy a legitimate debt can violate the Hostage Act, see Hung Shun Lin, 101 F.3d at 766, during that brief interval, there was confinement incident to a taxi fare dispute, which may have constituted an act of extortion,[5] but not the confinement of a hostage proscribed by the Hostage Act.

The convictions on Count 2 must be reversed.

II. Venue

Reynoso challenges venue in the Eastern District of New York only with respect to his conviction for violating the Hostage Act. With the reversal of his conviction on Count 2, the venue objection becomes moot. Venue was plainly proper for the alien transportation counts, since the transportation of Mendez began at the MacArthur Airport.

III. Admission of Rodriguez's Prior Act

Reversal of the Hostage Act convictions does not moot Rodriguez's

---

[5]The parties stipulated that a legitimate taxi fare from MacArthur Airport to Asbury Park was about $350, and the defendants' expert testified, without contradiction, that the average gypsy cab fare for the journey would be between $400 and $500.

-19-

challenge to the admission of his prior act, but it alters the analysis of his claim. We need not elaborate our conclusion that the admission of the 1993 episode was within the District Court's discretion, see United States v. Garcia, 291 F.3d 127, 136 (2d Cir. 2002); United States v. Carboni, 204 F.3d 39, 44 (2d Cir. 2000), because, even if the admission was error, it was harmless with respect to the alien transportation convictions. Indeed, Rodriguez makes no challenge to the validity of those convictions, the evidence for which was more than sufficient.

IV. Reynoso's Severance Claim

Had the conviction on the Hostage Act claim been upheld, we would have had serious concern about the risk of "substantial prejudice," see United States v. Werner, 620 F.2d 922, 928 (2d Cir. 1980), to Reynoso because of evidence about Rodriguez's 1993 episode, despite the District Court's limiting instruction. But the strength of the evidence on the remaining counts of transporting an alien render harmless any error that might have occurred with respect to denying Reynoso a severance. Like Rodriguez, Reynoso makes no challenge to the alien transportation convictions.

V. Failure to Order a Mistrial Based on Juror Apprehension

Rodriguez contends that the District Court exceeded its discretion in denying a motion for a mistrial based on reports that some jurors believed that Rodriguez was staring at them in a

-20-

threatening manner.  Early in the trial, the District Court informed the parties that some of the jurors felt that Rodriguez was "staring at them in what they perceive to be a threatening manner."  Some of them, the Court reported, felt "most uncomfortable."  Both Defendants immediately moved for a mistrial.   The District Court questioned Juror  No. 4 who had brought the issue to the attention of the Court.  The juror indicated that some of the jurors had noticed Rodriguez staring at the prosecutor and at them, and  some felt uncomfortable.  Juror No. 4 identified those jurors by seat number.  The Court noted that the jurors identified by Juror  No. 4 "are in the direct line with the prosecutor.  That's probably why they feel the way they do."

The District Court individually questioned the three regular jurors and two alternates who were identified as having observed Rodriguez staring at them.  All of them stated without qualification that the episode would not affect their ability to decide the case fairly.  Neither defendant disputed the credibility of the jurors' assurances or suggested that the jurors should be dismissed.

A district court has broad discretion in handling claims of jurors' partiality and taint that arise during trial.  See United States v. Rosario, 111 F.3d 293, 299 (2d Cir. 1997).  A district court's denial of motion for mistrial is reviewed for abuse of discretion.  See United States v. Smith, 426 F.3d 567, 571 (2d Cir. 2005).

Rodriguez contends that the District Court should have questioned all of the jurors, but there is no evidence that any of the other jurors witnessed any untoward conduct of Rodriguez or that they even knew about it. The District Court sufficiently considered the defendants' concerns, questioned the jurors who may have witnessed Rodriguez's staring, and determined that they could continue to be entirely impartial. The District Court acted well within its discretion in handling the incident and denying the motion for a mistrial.

VI. Denial of Rodriguez's Motion for a Mistrial Based on Evidence of Reynoso's Incarceration

Rodriguez contends that the District Court exceeded its discretion by denying his motion for a mistrial because Reynoso mentioned in his testimony that he was incarcerated. The Government asked Reynoso, "And you drive currently a gypsy cab for a living. Is that right?" Reynoso replied, "I used to. I'm in jail now." Rodriguez then moved for a mistrial, claiming that Reynoso's testimony that he was in jail would lead the jury to infer that both defendants were incarcerated, thereby prejudicing him. The District Court responded that "I don't see how you could in any way fault" the Government. The Government suggested that the District Court give a limiting instruction, but Rodriguez's counsel rejected this suggestion.

The mistrial motion was properly denied.  There was no reason to anticipate that the prosecutor's question would prompt Reynoso to volunteer that he was in jail, and the risk of prejudice even to Reynoso, much less Rodriguez, was virtually non-existent.

## VII. Claim of Vouching During Prosecutor's Summation

Rodriguez has submitted a pro se brief, contending that the Government improperly vouched for its witnesses in its rebuttal summation.  In the absence of objection at trial, the claim is reviewed for plain error, see United States v. Zichettello, 208 F.3d 72, 103 (2d Cir. 2000) ("flagrant abuse" must be shown).

Throughout his summation, Reynoso's counsel repeatedly accused Government witnesses of lying.  In rebuttal, the prosecutor responded with mild sarcasm:

> Three people that didn't know each other got their stories together and they came in here and they told a lie to all of you to punish these two men that none of them had ever met before, for what?
> What does Trooper Powell get a gold star on his uniform for coming in here?  The man came in here.

The prosecutor did not express a personal opinion about the credibility of the witnesses.  She merely invited the jury to consider the implausibility of Reynoso's claim that the witnesses were all committing perjury.  See United States v. Resto, 824 F.2d 210, 212 (2d Cir. 1987) (finding "that the remarks were permissible responses to contentions made by defense counsel in her summation").

-23-

VIII.  Instruction on the Alien Transportation Offenses

Rodriguez contends, in a brief submitted pro se, that the District Court's charge on transporting an illegal alien in violation of 8 U.S.C. § 1324(a)(1)(A)(ii) omitted an element of the offense. Specifically, Rodriguez claims that the district court failed to instruct the jury that the defendant must act "in furtherance of such violation of law." Id.  This is simply not the case.  The District Court's charge included the following:

> The fourth element of the offense which the government must prove beyond a reasonable doubt is that a defendant acted willfully in furtherance of the alien's violation of the law.  In order to establish this element, the government must prove that a defendant knowingly and intentionally transported the alien in furtherance of the alien's unlawful presence in the United States,  In other words, the evidence must show a direct and substantial relationship between the transportation and furthering the alien's unlawful presence in the United States.

> Transportation of illegal aliens is not, by itself, a violation of the statute if it is merely incidental to the alien's presence in the United States.  The law pr[o]scribes such conduct only when it is furthering an alien's illegal presence in this country.

X.  Sentencing Issues

The reversal of the defendants' convictions on the hostage taking count requires a remand for resentencing, see United States v. Rigas, 583 F.3d 108, 116 (2d Cir. 2009); United States v. Quintieri, 306 F.3d 1217, 1228 n.6 (2d Cir. 2002), and may well have some effect on their specific challenges to the Guidelines calculation.  Even though the

District Court imposed non-Guidelines sentences, and may well do so again, we have indicated that a correct Guidelines calculation must normally precede the decision to impose a non-Guidelines sentence. See United States v. Gotti, 459 F.3d 296, 349 (2d Cir. 2006); United States v. Crosby, 397 F.3d 103, 111 (2d Cir. 2005). For example, the District Court's enhancement for a vulnerable victim, i.e., Mendez's status as an unlawful alien, which might well have been proper in calculating the guideline for the hostage taking violation, might not be appropriate for the alien transportation counts, which already require that the victim be an unlawful alien.

We think it appropriate to remand for resentencing because of the reversal of the hostage taking convictions, and, in the event of an appeal after resentencing, defer until then consideration of any challenges to the new sentences.

## Conclusion

The convictions of both defendants on Count 2 (hostage taking) are reversed, their convictions on Counts 4 and 5 (alien transportation) are affirmed, and their cases are remanded for resentencing.